**STATE OF WISCONSIN, Plaintiff,**

**v.**

**Howard H. CALLAWAY, Secretary, Department of the Army, United States of America, et al., Defendants,**

**Upper Mississippi Waterway Association, Intervenor.**

**No. 73–C–183.**

United States District Court,
W. D. Wisconsin.

March 6, 1974.

Richard J. Boyd, Asst. Atty. Gen., State of Wisconsin, Madison, Wis., for plaintiff.

John O. Olson, U. S. Atty., Madison, Wis., for defendants.

Charles S. Van Sickle, Madison, Wis., for intervenor.

## OPINION and ORDER

JAMES E. DOYLE, District Judge.

This is an action for injunctive relief with respect to dredging activities in that part of the Mississippi River which forms a boundary of the State of Wisconsin. Plaintiff has moved for a preliminary injunction and for partial summary judgment as to the First Claim stated in its complaint. For the purpose of the motion for a preliminary injunction, I find as fact those matters set forth in the following section of this opinion under the heading "Facts," and for the purpose of the motion for partial summary judgment, I find that there is no genuine issue as to the material facts set forth in the following section of this opinion under the heading "Facts."

### Facts

As an important aid to navigation in the upper Mississippi River bordering the State of Wisconsin, the defendants have operated and maintained for many years, long prior to January 1, 1970, a system of locks and dams and a nine-foot channel. Unless a channel of nine feet or more in depth and of adequate width is maintained, commercial navigation on the river is seriously impeded, with major consequences to business, industry, agriculture, utilities, and consumers in a large geographical area which is dependent upon the movement of raw materials and finished goods by river vessels, principally barges.

The nine-foot channel has been maintained by the defendants by a dredging program each year. The dredging is to a depth of about ten feet, to insure the nine-foot clearance at all times. Each year, following the peaking of spring high water, surveying of the channel condition is commenced and it is continued thereafter while weather permits. The points at which dredging is required and the quantities of spoil materials dredged from the channel vary from year to year. However, there is a good probability that more than 700,000 tons of spoil material will be dredged from the channel and deposited within the boundaries of the State of Wisconsin in any given calendar year, including 1974. The annual cost of this dredging operation is approximately $700,000, or more.

The spoil material dredged from the channel is deposited on lands and in water near the dredging sites, including the shoreline, islands, and sloughs. The method by which the spoil material is deposited and the locations in which it is deposited have the following effects, among others, each year and cumulatively over the years: the floodway of the river is obstructed; the river is increasingly channelized and there is a reduction in the flow of water into backwater areas; eutrophication of the backwater areas increases and the backwater areas are reduced in size; the flushing effect on the backwater areas during high-water periods is reduced; the overall surface water area is reduced; the appearance of the river area is altered; navi-

gation routes into sloughs which have been fishing areas in the past are closed off; the life cycle of many sport and commercial fish species is altered in proximity to wing dams and rip rap, and in proximity to both the channel sides and the shore sides of islands; natural shoreline vegetation which serves as cover and food for many fish species is lost; the diversity of fish habitat is reduced; the increased eutrophication of backwater areas results in increased summer and winter fish kills; and the wildlife and furbearer resting, feeding, and reproduction habitat is degraded.

If the usual pattern of dredging and the depositing of spoil material is engaged in by the defendants in 1974, irreparable harm to the environment will occur; the harm will be as described in the immediately preceding paragraph of this opinion. If no dredging of the channel by the defendants is permitted in 1974, irreparable economic harm will be suffered by many industrial, commercial, and agricultural enterprises, by utilities, by consumers, and others, as well as various forms of harm to individuals and groups by further reduction of energy sources already severely taxed.

A draft environmental impact statement (EIS) with respect to the operation and maintenance of the nine-foot navigation channel in the portion of the Mississippi River in question here has been prepared as of February 25, 1974, and its circulation to interested agencies and groups has commenced.

On October 10, 1972, defendants entered into a contract with North Star Research Institute of Minneapolis for the preparation of "an environmental planning report" with respect to the defendants' maintenance dredging and regulation of the navigation pools on the Mississippi River from Guttenberg, Iowa, to Minneapolis, Minnesota, which includes those spoil material deposit areas within the State of Wisconsin which are in question here. This contract was intended to obtain research necessary to determine the scope of a larger contract with the Institute for the preparation of "an environmental impact assessment report." The latter contract was entered into in January, 1973; the price was $225,000; as of June 22, 1973, it was anticipated that the contract work would be completed by January, 1974. Despite the arrangements which had been made with the Institute, the defendants have consistently declined in this lawsuit to acknowledge that their channel dredging operations constitute an action with respect to which existing law requires the preparation, circulation, and filing of an EIS.

Nevertheless, the defendants do not intend to perform any maintenance dredging within the State of Wisconsin during 1974 until an EIS has been filed with the Council on Environmental Quality (CEQ). Unless prevented from doing so, however, defendants intend to do such dredging, prior to filing an EIS with the CEQ, as emergency conditions may necessitate at a particular site. No such emergency conditions were known to the defendants as of October 18, 1973. Nothing in the record suggests that when defendants resume their dredging operation, they will employ methods which differ from those employed by them in the past.

This action was commenced on June 19, 1973. There followed certain proceedings in which the plaintiff sought interlocutory injunctive relief against the placing of spoil materials upon a few specific, limited areas within the State of Wisconsin where defendants were engaged in dredging, or threatened to engage in dredging, at specific times. Limited interlocutory injunctive relief was granted on June 22, 1973, with respect to a specific location; the injunction was vacated on July 10, 1973.

## OPINION

■ Plaintiff State enjoys standing to bring this suit because the spoil material is deposited within its boundaries.

■ The Mississippi River dredging operation performed annually by the defendants, which involves depositing spoil

material within the boundaries of the State of Wisconsin, is a "major Federal [action] significantly affecting the quality of the human environment," within the meaning of 42 U.S.C. § 4332(2)(C). Defendants are required by § 4332(2)(C), and by §§ 1500.5 through 1500.11 of CEQ's guidelines for the Preparation of Environmental Statements, to prepare, circulate, and file an EIS covering this dredging operation before commencing it. Assuming no complications or delays in the course of circulating the EIS, considering the responses, and review by CEQ, and assuming that the defendants' ultimate decision is to proceed with the dredging operation either in the accustomed manner or in some modified manner, the guidelines would not permit the operation to commence until about June 1, 1974.

However, defendants advance three major contentions: (1) Their channel dredging operation was an ongoing project or program, as of January 1, 1970, when the National Environmental Policy Act became effective, and the application of the Act to such ongoing projects and programs allows for flexibility. (2) Even if the requirements of § 4332(2)(C) are directly applicable to defendants' anticipated dredging program in 1974 and thereafter, before injunctive relief is granted, the equities must be balanced, and the equities dictate that injunctive relief be withheld. (3) The basis for injunctive relief is removed by the declaration of defendants' intention to engage, prior to the filing of an EIS with the CEQ, only in dredging at particular sites if emergency conditions arise.

■ On May 2, 1973, the CEQ published in the Federal Register a proposed revision in its guidelines for the preparation of environmental impact statements, and the revised guidelines as promulgated by CEQ on August 1, 1973, were made applicable to all draft and final impact statements filed with the CEQ after January 28, 1974. 1 Environmental Law Reporter 46003, 46009.

Section 1500.13 provides, in part: "The section [4332(2)(C)] procedure shall be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of the Act on January 1, 1970." It is clear that § 4332(2)(C) applies in full force to defendants' 1974 dredging operations. An earlier version of the CEQ guidelines (then number 11) had provided that the § 4332(2)(C) procedure should be applied to ongoing projects and programs "to the maximum extent practicable." Even under that version if applicable, which it is not, it was entirely practicable for the defendants to comply with the § 4332(2)(C) procedure some time after January 1, 1970, and well before spring, 1974. They simply chose not to do so.

■ When the application of § 4332 to defendants' 1974 dredging operation is as clear as I consider it to be, when the CEQ's proposed revision in the guidelines was published as early as May 2, 1973, when this very lawsuit was commenced as early as June 19, 1973, when a limited preliminary injunction as to a small portion of the 1973 operation was entered as early as June 22, 1973, and when irreparable environmental consequences are virtually certain to flow from 1974 dredging, I consider it doubtful whether the court should engage in balancing the equities. I appreciate fully the injury which will befall large numbers of enterprises and people if the river channel depth of nine feet is not maintained. However, in the National Environmental Policy Act (NEPA), Congress imposed upon the defendants and other federal agencies a grave obligation, not to refrain from any major action which might significantly affect the quality of the human environment, but to lay their cards on the table in full public view, and then to proceed only after obtaining and giving serious consideration to the responses from all interested agencies, organizations and individuals. When this grave obligation is not honored, it is all too easy for the of-

fending agency, and those like the intervenor here who will be adversely affected by an injunction, to argue that the court must now engage in a balancing function which is in truth the very function which the defendants were obliged by law to perform, after full public disclosure of the implications of its anticipated project. Nevertheless, assuming that I am called upon to engage in some degree in a balancing of the equities, I consider that the equities lie in favor of appropriate injunctive relief. If this requires defendants to expend additional funds and engage in extraordinary procedures in order to avoid environmental damage while still maintaining navigation, this is a consequence which defendants must accept.

■ Finally, there must be considered the effect of defendants' answer to plaintiff's interrogatories to the effect that prior to the filing of an EIS with the CEQ,[1] defendants intend to perform no maintenance dredging this year, except for such dredging at particular sites as emergency conditions may require, but that following the filing of the EIS with the CEQ, defendants anticipate that maintenance dredging will be required. It is contended that the court may thus concern itself only with whatever the proportions of such emergency dredging may be and only with whatever environmental effect may be produced by such emergency dredging. The suggestion is that such emergency action will not be "major," and that its effect on the quality of the human environment will not be "significant," within the meaning of § 4332(2)(C). I imply no skepticism about the representation contained in defendants' answers to interrogatories. But defendants' conception of what emergency conditions may require remains wholly undefined. Also, there is no representation whatever that the method of depositing spoil material will be altered with respect to such

emergency dredging as may be done nor with respect to maintenance dredging when it is resumed. Plaintiff has made a strong showing that defendants threaten to engage in 1974 in the same practices which they have engaged in for many years. To escape the effect of that showing, I consider that the defendants are obliged to make a far more explicit representation than they have yet made with respect to any dredging operations they may engage in prior to the completion of the procedures required by § 4332(2)(C) and the CEQ guidelines. I am affected also by the assumption that the defendants intend to honor fully the spirit of § 4332(2)(C) and the CEQ guidelines; that they will consider seriously alternative methods described in the draft EIS and suggestions which may be offered by interested agencies, groups, and individuals; and that the decision on the methods to be employed when maintenance dredging is resumed, and the implementation of any changes in those methods, may necessarily require a period of time substantially greater than about 90 days. In that event, emergency dredging may mean something quite different than emergency dredging prior to about June 1, 1974, would mean.

## ORDER

Upon the basis of the entire record herein, it is ordered that the plaintiff's motion for summary judgment as to the First Claim of its complaint is granted.

It is further ordered that until the procedures required by 42 U.S.C. § 4332(2)(C), and the current Guidelines for Preparation of Environmental Impact Statements promulgated by the Council on Environmental Quality, are fully complied with by the defendants, the defendants are enjoined from depositing any spoil material from the Mississippi River upon lands or within waters lying within the boundaries of the State

---

1. Defendants' answers to the interrogatories speak in terms of filing the EIS with the CEQ. However, I do not take this literally. I assume the defendants intended to say that maintenance dredging would be withheld until the procedures contemplated by the CEQ guidelines are completed.

of Wisconsin; provided, however, that the defendants may apply to this court from time to time for modification of this injunction in emergency situations; provided, further, that any such application for modification is to specify the nature of the emergency situation, to describe the exact location, to describe the specific procedures which the defendants desire to employ in disposing of spoil materials, and to state whether the agreement of the plaintiff to the requested modification has been obtained.

In light of the above order granting the plaintiff's motion for summary judgment, no action on plaintiff's motion for a preliminary injunction appears appropriate. However, I hereby record my intention that should the order granting summary judgment be vacated for any reason, the defendants should be enjoined, in the manner described above, during the pendency of the lawsuit.