STATE OF MISSISSIPPI, ex rel. Mike
MOORE, Plaintiffs,

v.

John O. MARSH, in his Official Capacity
as Secretary of the Army, Robert W.
Page, in his Official Capacity as Assist-
ant Secretary of the Army, Civil Works;
Lt.G. E.R. Heiberg, III, in his Official
Capacity as Chief of Engineers, Depart-
ment of the Army; and Col. Francis R.
Skidmore, in his Official Capacity as
District Engineer, Vicksburg District,
U.S. Army Corps of Engineers, Defen-
dants,

Mississippi Wildlife Federation; Leflore
County Hunting and Fishing
Association, Intervenor Plaintiffs.

Civ. A. No. J88–0421(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

March 29, 1989.

Mike Moore, Leslie Scott, Tim Waycaster, Jim Warren, Atty. Gen.'s Office, Dan M. McDaniel, Jr., Paul L. Gunn, Jackson, Miss., for plaintiffs.

George L. Phillips, U.S. Atty., Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

This case is before the Court on cross-motions for summary judgment. There is presently an injunction, issued by this Court on September 7, 1988, enjoining the Defendants from "further planning, financing (except for the funds necessary to comply with the [National Environmental Policy Act] and applicable regulations), contracting or constructing in connection with the Yalobusha River Maintenance Project until such time as a final hearing on the merits" could be had. This injunction was limited by an Agreed Order entered November 21, 1988, allowing the Defendants, through their contractor, to remove debris from seventeen acres. The Court now considers whether to issue a permanent injunction over all construction and planning in connection with the Yalobusha River Main-

tenance Project and to declare lawful and set aside a decision by the Defendants not to prepare an environmental impact statement ("EIS").

The Court has reviewed the voluminous record prepared in proceedings before the Army Corps of Engineers, the record made pursuant to the preliminary injunction, the pleadings, briefs, memoranda, affidavits and exhibits submitted by the parties.[1] The Court finds that the Motions of Plaintiff and Intervenor Plaintiffs for Summary Judgment are well taken and that there is no genuine issue of material fact remaining in this case. For reasons set forth below, the Court will grant relief to the Plaintiff and Intervenor Plaintiffs, declare that the Army Corps of Engineers acted unlawfully in failing to prepare an EIS, and enter an injunction on the construction and planning of the Yalobusha River Maintenance Project until such a document is appropriately prepared.

## CONTENTS

I. INTRODUCTION ........................................ 1491

II. THE ENVIRONMENT OF THE YALOBUSHA RIVER AREA ............................................ 1491

III. THE YALOBUSHA RIVER MAINTENANCE PROJECT ........................................... 1492

IV. CONGRESS AND THE YRMP ......................... 1492

V. THE DECISION OF THE CORPS NOT TO DO AN ENVIRONMENTAL IMPACT STATEMENT ................ 1493

VI. CONCERNS OF OTHER AGENCIES .................... 1497

VII. CONTRACTING AND CONSTRUCTING THE YRMP .... 1498

VIII. NEPA, THE CORPS AND THIS COURT ............... 1498
 A. The National Environmental Policy Act .............. 1498
 B. Corps Regulations ................................. 1500
 C. The Corps Decisions .............................. 1502
 D. Political Question ................................. 1502
 E. The Scope of Review............................... 1502
 1. Judicial Review: The FONSI (33); 2. Judicial Review: CE Classification and Corps Regulations (34)

IX. THE REVIEW OF THE CORPS DECISION ............. 1504
 A. The Reasonableness of the FONSI.................. 1504
 1. The Impact of the YRMP (36); 2. Reliance on Prior EIS's (39); 3. Reliance on Mitigation (42)
 B. The Error of Categorical Exclusion .................. 1507

X. THE NATURE OF THE REMEDY ...................... 1507

XI. SUMMARY ......................................... 1508

### Appendices
A. CORRESPONDENCE BETWEEN THE CORPS AND OTHER AGENCIES........................................ 1508
 A. The Environmental Protection Agency .................. 1508
 B. The U.S. Fish and Wildlife Service .................... 1513
 C. The State of Mississippi ............................. 1516
 D. The Mississippi Wildlife Federation ................... 1518

B. OTHER CORPS REPORTS............................. 1519
 A. Final EIS, Flood Control, Mississippi River and Tributaries, Yazoo River Basin, Mississippi, September 1975 ....... 1519
 B. Final Environmental Statement, Operation and Maintenance, Arkabutla Lake, Enid Lake, Grenada Lake and Sardis Lake, Mississippi, August 1978 ................ 1519

---

**1.** As will be discussed, the review of the agency's finding of no significant impact is based on the four-volume administrative record provided to the Court. Other materials presented which were directed to the facts of the case were reviewed to determine that no genuine issue of material fact remained and to determine the sufficiency of the record.

B. OTHER CORPS REPORTS—Continued
 C. An Interim Report of the Yazoo River Basin, Mississippi
 Lake Operations and Outlet Channels Reevaluation Re-
 port, August 1987 ................................. 1520
 D. Upper Yazoo Basin Fish and Wildlife Mitigation Study,
 Draft Feasibility Report and Environmental Impact
 Statement ........................................ 1520

I.

## INTRODUCTION

This is a suit by the State of Mississippi ("the State") against the United States Army Corps of Engineers, ("the Corps") in which two environmental groups have intervened on the side of the State. The central issue presented is whether the Corps was reasonable in its decision not to prepare and file an EIS before planning and beginning construction on the Yalobusha River Maintenance Project ("YRMP"). A related issue is whether the YRMP qualified as a project within a categorical exclusion ("CE"), according to the meaning established by the Council on Environmental Quality ("CEQ"). The YRMP was first planned in 1985 by the Corps in order to restore the Yalobusha River to its water flow capacity set in 1953. The Corps prepared an environmental assessment ("EA") and a separate finding of no significant impact ("FONSI"), which it claimed satisfied its obligations under the National Environmental Policy Act of 1969, 42 U.S.C. § 4331, et seq., ("NEPA"), and applicable regulations promulgated by both the Corps and the CEQ. The State of Mississippi filed suit to enjoin the Corps from working on the project until an EIS had been prepared. The Corps claimed in defense both that its FONSI was reasonable and that the YRMP is exempted from the requirement of environmental review under regulations it issued in 1988. The Court finds today both that the decision of the Corps not to prepare an EIS based upon a finding that the project would have no significant impact to the human environment was not a reasonable decision and that the Corps was clearly in error when it described the project as within a categorical exclusion from environmental review.

II.

## THE ENVIRONMENT OF THE YALOBUSHA RIVER AREA

The Yalobusha River is located in northwest Mississippi roughly one hundred miles south of Memphis, Tennessee. The Yalobusha River is the major source and the drain of Grenada Lake, which was created by the Corps in 1954 as a part of the Yazoo Headwater Project. Grenada Lake is located in Grenada, Calhoun and Yalobusha Counties, three miles northeast of Grenada, Mississippi. The Yalobusha River flows approximately sixty-four miles from Grenada Lake Dam to its confluence with the Coldwater River, forming the Yazoo River near Greenwood, Mississippi.

Just north of Avalon, Mississippi, lies the Malmaison Sump, an area of approximately 24,000 acres which has become increasingly important to migratory waterfowl which rely upon flooding in the area as a source of habitat. These lands also support a variety of non-migratory waterfowl as well as song birds and quail. The amount of available wetlands in the Yazoo River Basin, commonly known as the Delta, has diminished considerably over the last thirty years as a result both of increased clearing of woodland for agricultural use and of flood control. The Mississippi Department of Wildlife Conservation owns and manages 10,335 acres of the sump as the Malmaison Wildlife Management Area. The Yalobusha supports at least fifty-three species of fish, including sport fish such as bass, crappie and blue gill, and rough fish such as catfish and buffalo. The banks of the Yalobusha River contain stands of young hardwoods, with a trunk diameter of up to one foot. Game species in the area of the Malmaison Sump include white tail deer, squirrel, cottontail rabbit, turkey, raccoon, and small furbearers. Although the present quantity and diversity of wildlife habitat throughout the upper Yazoo Basin is less than that prior to flood control in the

area, the area of highest wildlife concentration is the remaining uncleared swampland of the Delta, including the Malmaison Sump. Much of the region has been dedicated to agriculture. Principal crops include cotton, soybeans, rice and wheat. There are no known endangered species, or species proposed for the endangered list in the area.[2]

### III.

### THE YALOBUSHA RIVER MAINTENANCE PROJECT

The YRMP is designed to allow 5,100 cubic feet of water to flow through the river each second. This level of water flow capacity was designated in 1954 to allow drainage of Grenada Lake. Over the three decades between initial construction and the start of the YRMP, sedimentation and bank shifts reduced this capacity to approximately 3,000 cubic feet per second.

The YRMP is a dredging and bank-clearing operation designed to dredge the river from 0.8 miles above its mouth to 12.2 miles above the mouth. Some 1,297,000 cubic yards of dredge spoil would be removed by dragline from the river bottom, which is now 65 feet in width but would be widened to 80 feet. The banks would be cleared of brush, and the spoil deposited on 41 acres of wetlands, over areas of dredge spoil dumped in 1954. The bank would be stabilized by the placement of riprap on each bank near the Whaley Bridge and the Avalon Bridge. Only one bank would be used for dredging equipment.

According to the project proposal and EA, the project would reduce seasonal flooding by the Yalobusha River on 2,900 acres. 1,600 acres of this are wooded wetlands. 315 acres of woodlands were to be cleared, two-thirds of which is in a Corps right-of-way. All of this land had been cleared by the date of this Court's injunction. The project will redirect silt and water from lands adjoining the Yalobusha to the Yazoo River.

According to an affidavit submitted by James C. Chandler, Chief of the Corps' Environmental Analysis Branch, the actual reduction in flooding would only affect 800 acres. The Court relies upon a map attached to the affidavit of Larry Banks, the Corps' Supervising Hydraulic Engineer, to consider flooding reductions. That map shows lands now flooded and lands which will be flooded after the completion of the YRMP. The reasonableness of the FONSI is still assessed according to the project description in the EA. The Court finds that its ruling would not have been altered by the lesser acreage. The basis of the Court's ruling, as detailed below, is the Corps' decision-making process: not the data alone but its analysis. Such of the ruling as is based on the changes in flooding patterns which would occur from the YRMP would still have effect, reading the word "may" for "will." Further, it is the Corps which has argued that the case shall be reviewed solely on the record.

### IV.

### CONGRESS AND THE YRMP

The YRMP is an element of the Yazoo Headwater Project, a portion of the Yazoo River Basin Project, which covers 13,400 square miles of northwest Mississippi adjacent to the Mississippi River. The Yazoo River Basin Project is an overall plan containing three separately-authorized major projects designed to protect against both headwater floods of streams in the basin and backwater floods of the Mississippi River, while providing runoff improvement in the alluvial valley which is the region known as the Mississippi Delta. Authority for the Yazoo River Basin Project is based in a series of Congressional acts, beginning in 1936, providing discretionary authority

---

**2.** The primary source for this section is the environmental assessment prepared by the Corps, supplemented by *Statewide Fisheries Management Project, Fishes of the Lower Yalobusha River, the Upper Yazoo River Basin Fish and Wildlife Mitigation Study, Draft Feasibility Report and Environmental Impact Statement,* and an interim report of the *Yazoo Basin, Mississippi–12074 Lake Operations and Outlet Channels Reevaluation Report.* All of these are in the Administrative Record.

to the Corps to create levees, floodways or channels in creating seven reservoirs as a flood control measure in northern Mississippi. Subsequent enactments in 1937, 1938, 1941, 1946, and 1965 provided for extensions and improvements on the Yazoo and Yalobusha Rivers and the construction of Grenada Lake. Section 108 of Joint Resolution 96–412, passed in 1980, directed the Chief of Engineers to review flood control regulation procedures for the Yazoo Basin headwater lakes. The *Yazoo River Headwater Project, Yalobusha River Maintenance Report* was delivered to Congress on April 18, 1985. That report presented recommendations that channel maintenance along the lower 11.4 miles of the Yalobusha River be commenced in order to increase the flow of waters through that portion of the river to their levels authorized in 1953.

## V.

## THE DECISION OF THE CORPS NOT TO DO AN ENVIRONMENTAL IMPACT STATEMENT

Plans for the YRMP are first documented in a request made on April 18, 1985, from the Vicksburg District Army Corps of Engineers to the President of the Mississippi River Commission, a higher echelon office of the Corps. That report stated in paragraph 5.a. that "[t]his project was not covered specifically in any previous EIS within the region. It will necessitate an environmental assessment and/or possibly an EIS." Paragraph 5.d.(6) noted that "[t]he project would cause approximately 1,600 fewer acres to be flooded each year. This would impact negatively on migratory waterfowl for the area. Additionally, 1,300 fewer acres of agricultural land would be flooded." The proposal notes that the U.S. Fish and Wildlife Service ("FWS") had already raised environmental concerns.[3]

3. Paragraph 5.i states:
 "The U.S. Fish and Wildlife Service (FWS) assessed impacts on the [YRMP] and submitted a draft report dated January 6, 1985 ... representatives of the Vicksburg District met with FWS personnel to determine an appropriate method to address the environmental issue noted in the report. It was deter-

The Mississippi River Commission approved the report submitted by the Vicksburg District subject to various comments. The Commission noted that paragraphs 5.a. and 5.h.

> are not consistent. In paragraph 5.a. it is stated that an environmental assessment and/or EIS is necessary, whereas in paragraph 5.h. it is stated that there will be no significant adverse impact on the environment. The U.S. Fish and Wildlife Service Report would indicate that impacts are significant.

Paragraph C. noted that,

> it is stated that the environmental issues noted in the U.S. Fish and Wildlife Service Report will be examined in the Lake Operations and Outlet Channels draft report scheduled to be completed in late FY 1985. Discussions with your Planning personnel indicate that impacts associated with the maintenance project will not be addressed in the draft report; only impacts associated with any proposed new work would be addressed. This contradiction needs to be resolved.

The Vicksburg District responded to the Mississippi River Commission on October 29, 1985. That response stated that,

> [t]he last sentence of paragraph 5.a. should be revised to the following: "It will necessitate an environmental assessment." ... The last sentence of paragraph 5.i. should be deleted and the following added. "The current Vicksburg District position on maintenance projects is that there is no mitigation for channel maintenance since this work restores a reach of the Yalobusha River to its original authorized capacity. No mitigation measures will be included for the environmental issues noted in the U.S. Fish and Wildlife Service Report."

mined that these issues would be examined in a Lake Operations and Outlet Channels draft report scheduled to be submitted in late FY 1985 as an interim report to the Yazoo River Basin, Mississippi, study."
The FWS letter is discussed in Appendix A, Section B of this Memorandum Opinion and Order.

The total cost of the project, based on January 1985 price levels, was $4,363,000. The attachment to the proposal requesting review under Section 404 of the Federal Water Pollution Control Act, which would determine the acceptability of the project by reviewing its effect on water pollution, described the project in detail as it was then planned.[4] Paragraph 1.f. noted that

This project was not covered specifically in any previous EIS within the region. It will necessitate an environmental assessment which will be used to determine the need for an EIS or FONSI.

The Corps issued a public notice regarding its plans on September 12, 1986. That release noted that "The proposed project was not covered specifically in any previous EIS. An Environmental Assessment for this project will be prepared by the Vicksburg District, Environmental Analysis Branch." The public notice was sent to 63 public agencies, individuals and news organizations. On February 6, 1987, the District Engineer issued an initial FONSI which states:

[A]n environmental assessment of the proposed channel maintenance on the Yalobusha River has been completed by the Vicksburg District, U.S. Army Corps of Engineers.

The channel maintenance work consists of restoring the carrying capacity of the Yalobusha River between miles 0.8 and 12.2 to the authorized 5,100 cubic feet per second. The alternatives of taking no action and carrying out the required dredging by dragline and hydraulic methods have been evaluated. These evaluations lead to the conclusion that the dragline method was in the overall best interest of the public.

Therefore, based on the Environmental Assessment, I have further concluded that the proposed action will not require

further environmental documentation. The rationale for this conclusion is based on the fact that previous Environmental Impact Statements (EIS) have adequately covered the operational and maintenance aspects of this project. Additionally, mitigation measures for the Yazoo Headwater Project, of which the Yalobusha River is an integral feature, were authorized to mitigate adverse environmental impacts associated with construction, operation, and maintenance.

The adverse environmental impacts of this project have been mitigated. Based upon this and in compliance with applicable environmental quality laws and regulations, it is my finding that an EIS is not required and that a finding of no significant impact is appropriate.

/S/ Pat E. Stevens IV,
Col., Corps of Engineers
District Engineer

In the EA accompanying the FONSI, the Corps noted under "Need for Action," that the project "would allow for a more effective flood control operation of Grenada Lake by decreasing the chance of having carryover." Under the heading of "Environmental Impacts," the report discusses terrestrial resources. Paragraph 12. notes that

Implementation of the selected maintenance alternative will result in a reduction in the number of acres seasonally flooded within the project area (Table EA–1). Historically, the principal impact on wildlife by flood reduction in bottomland forests in the project area has been the conversion of forested habitat to agricultural lands. The bottom-land hardwoods that will be adversely impacted by this maintenance activity represent a natural regeneration of trees along the right-of-way following the original con-

---

**4.** The project would require dragline dredging of approximately 1,428,250 cubic yards of sludge. The dredging machinery would operate on alternate sides of the river and require clearing along the work reaches to approximately 300 feet from the top of the selected bank for construction access and placement of excavated material. The project would require 640 acres of right of way, of which approximately 504 acres were then held and 136 were to be acquired. Sludge was to be dumped in 160 acres, of which 150 are forests and 10 are cleared. Bank stabilization at the bridges would require 2,940 tons of riprap, 935 cubic yards of bedding stone, and 2,350 cubic yards of excavation. Clearing of 295 acres was required for the project. This description is largely that of the final project.

struction. This regeneration will occur after the dredging is completed. The likelihood of any additional lands being brought into agricultural production as a result of the required maintenance work is very remote, given present day agricultural economics and the limited amount of uncleared land which will receive reduced flooding. *The net effect on migratory waterfowl will be an approximate 12 percent reduction in seasonally flooded habitat, from approximately 25,200 to 22,300 acres.*

TABLE EA–1
AVERAGE SEASONAL FLOODED ACRES
NOVEMBER–MARCH

| Item | : Wooded | : Cleared |
|---|---|---|
| | (acres) | (acres) |
| With Project | 14,000 | 8,300 |
| Without Project | 15,600 | 9,600 |

(Emphasis supplied by the Court.) Under "aquatic resources" the report notes:

13. The Yalobusha River is typical of delta streams in that it is slow and meandering, has silt bottoms, and is relatively stable insofar as bank erosion and bed load movements are concerned. The river was once an excellent habitat for a variety of sport and commercial fish species. Presently, the productivity of the River has been reduced so that it now supports mostly gizzard shad, carp, catfish, and other species tolerant of high silt and heavy agricultural chemical loads.

14. The proposed maintenance work will contribute further to an aquatic environment that can only support species tolerant of heavy silt loads. Additionally, overbank flooding would be reduced, thereby decreasing available spawning areas for those silt-tolerant species present.

The EA notes both that there are neither endangered, threatened or proposed species nor prime and unique farmland in the project area and that the project is consistent with Executive Orders No. 11988 and 11990 dealing with protection of flood plains and wetlands. According to the EA, although navigable waters of the United States, including wetlands, would be impacted by the discharge of dredged material, this impact would be minimal. The EA considered and rejected two proposed alternatives: no action and hydraulic dredging.[5]

Other considerations discussed in the EA included discussions of the project status as operation and maintenance[6] and, based in part on that status, a rejection of any obligation of the Corps to mitigate any environmental impact which might be caused by the YRMP.[7] The coordination section of the EA will be discussed in Section VI below.

5. Page EA–5 provides:
ALTERNATIVES TO THE PROPOSED PLAN NO–ACTION ALTERNATIVE
19. This action was not considered viable since it would contribute to further reducing the channel capacity on the Yalobusha River, thereby reducing authorized flood protection within the Yazoo Headwater Area.
HYDRAULIC DREDGING ALTERNATIVE
20. This alternative is the same as the selected plan except that it would be accomplished by hydraulic dredge. It was not selected because the proposed channel configuration being primarily "side cut" would be extremely difficult to attain by hydraulic dredge. Also, approximately 504 acres are available in this reach under previous easement.

6. Paragraph 21. provides:
Channel improvements on the Yalobusha River were constructed in 1953 along its entire 64–mile length. Normal follow up operation and maintenance should have been performed at 20 years. However, because of other considerations, maintenance was de-layed. If maintenance had been timely (about 1973), the majority of the 2,900 acres that now flood may never have flooded, nor would much of the forested acreage along the riverbank have reached the current stage of maturity. *This tardiness of maintenance has produced interim "dividends" for many years for wildlife and waterfowl.* (Emphasis supplied by the Court.)

7. Paragraph 71. provides:
As a policy, mitigation is not required for maintenance work since, as a rule, mitigation is accomplished within the context of the overall project including the operation, maintenance, and replacement which is calculated into the project during formulation. Authorized features for mitigation of fish and wildlife damages attributed to the Yazoo Headwater Project included water control structures at Old Techeva Creek and McIntyre Lake, purchase of lands in the Hillside Floodway, and installation of water control structures in the Will M. Whittington Auxiliary Channel to facilitate shallow flooding of low areas.

Following receipt and response to comments on the draft EA, the Corps released its final FONSI and EA on July 27, 1987. This FONSI contains the language that:

... the proposed action will not require further environmental documentation. The rationale for this conclusion is based on the fact that previous Environmental Impact Statements (EIS) have adequately covered the operational and maintenance aspects of this project.... The adverse environmental impacts of this project are not subject to mitigation since the project represents operation and maintenance work. Based upon this and in compliance with applicable environmental quality laws and regulations it is my finding that an EIS is not required and that a Finding of No Significant Impact is appropriate.[8]

/s/ Pat M. Stevens IV
Colonel, Corps of Engineers
District Engineer

The final EA accompanying the FONSI describes 34 interrelated components of the Yazoo Headwater Project, each of which is individually described.[9] Under "Authorized Fish and Wildlife Measures," the EA reviews actions by the FWS and the Corps throughout the YHP area, including the authorization of seven water control structures. Further,

[c]hanging land use patterns within the Basin have caused both the Corps and FWS to reevaluate the suitability of those approved structures from a fish and wildlife standpoint. The Corps is currently conducting planning studies to evaluate the feasibility of mitigating fish and wildlife losses resulting from certain features of the Flood Control–Mississippi River and Tributaries, Yazoo Basin, Yazoo Headwater Project.

The EA then describes project authority relying upon the Flood Control Act of 1946, and describes the selected plan. The EA finds the following "Significant Resources":

Agriculture and bottom-land hardwoods comprise the major land uses. These resources, along with seasonal flooding, provide important habitat for migratory waterfowl. Remaining bottom-land forest within the Yazoo Basin totals approximately 20 percent, with the majority being in public ownership and collectively in large hunting clubs. Upstream of the project site the State of Mississippi owns and operates the Malmaison Wildlife Management Area (WMA). The Malmaison WMA in association with the remaining bottom-land hardwoods in that portion of the Yazoo Basin provides habitat for numerous game and nongame species. Additionally, the Malmaison Sump area has been identified by FWS as part of the largest wetland complex in the Yazoo Basin.

The EA noted that there were no endangered, threatened or proposed endangered species in the project area and that there was no prime or unique farmland in the project area. Discussion of impacts to wildlife was expanded, relying on data from the Mitigation Study.[10] The soil and erosion control section of the final EA was significantly expanded from earlier drafts quoting information on the soil types and the stream beds and banks. The EA noted that the proposed channel configuration, widening instead of deepening the channel, would allow for increased, long-term bank

**8.** In the final environmental assessment, there is no detailed description of the use of lands which would no longer flood after completion of the project.

**9.** These projects include: the Yazoo City Protection Works, Arkabutla Canal, the Tucker Bayou, Yocona River, the Reservoirs, the Greenwood Protection Works, the Belzoni Protection Works, the Upper Yazoo Projects, Will M. Whittington (Lower) Auxiliary Channel, the Main Stem Feature, Little Tallahatchie River, Yalobusha River, Cassidy Bayou, David–Burrell Bayou, Bobo Bayou, McKinney Bayou, Tchula Lake,

Lake Cormorant, Opossum Bayou, Hurricane Bayou, Tillatoba Creek, Ascalmore Creek–Tippo Bayou, Potacocowa Creek, Teoc Creek, Big Sand Creek, Pelucia Creek, Abiaca Creek, Chicopa Creek, Hillside Floodway (Fannegusha and Black Creeks), Miscellaneous Ditches, and the Demonstration Erosion Control (DEC) Project.

**10.** *Upper Yazoo Basin Fish and Wildlife Mitigation Study, Draft Feasibility Report and Environmental Impact Statement, August 1988.* This report is more fully discussed in Appendix B, Section D, below.

stability. The more stable channel configuration would decrease the amount of sediment accumulation and lessen . erosion. The floodplain and wetland protection language of the earlier EA's was repeated, finding both that the impact of this project would be "minimal" on wetlands and that there were no practicable alternatives to the "now required maintenance work" on the river. The results of the Section 404 review were restated that the "unavoidable adverse impact" of the deposit of sludge over 41 acres of wetlands was necessary as "there are no practical alternatives as to placement of this excavated material."

The EA discusses three alternatives to the proposed plan. The "No Action" alternative was rejected as in the draft. Language considering the hydraulic dredging alternative was expanded although it was not materially changed. The EA then considered the proposal of the U.S. Fish and Wildlife Service, which was essentially a plan to purchase flooding areas and maintain them as wetlands; this plan would require rehabilitation of the Tippo Bayou structure and a change in the "rule curve" or operating limits of Grenada Lake.[11] The Corps rejected this alternative in paragraph 69. because:

a. The portion of the Yalobusha River on which maintenance would occur is separate from the LOOC study.[12] The proposed [YRMP] would be accomplished under Operation and Maintenance authority. *No authority to acquire lands or flooding easements exists under operation and maintenance.* If necessary for the Basin's flood protection, these lands can be flooded without payment of easements so long as the flooding remains within the limits of historical flooding in the without-project condition since there is only a reduction in flood protection already provided. Even though downstream lands are occasionally flooded by releases from the Yazoo Basin lakes, the overall effect is that the downstream lands have benefited from the project. Therefore, there is no requirement for easements to occasionally flood the downstream lands with lake releases.

(Emphasis supplied by the Court.) The FWS alternative was also rejected because the Tallahatchie River Channel is inadequate to regulate the Tippo Bayou structure and the rule curve change would flood lands downstream, which was the FWS purpose but was not the purpose of the lakes.

The EA repeats language from the draft concerning the nature of operations and maintenance work, especially that the gains of wildlife on the Yalobusha were "dividends" resulting from tardy repair. Mitigation language was similarly repeated, with the addition that "mitigation studies are continuing for certain features of the Flood Control–Mississippi River and Tributaries, Yazoo Basin, Yazoo Headwater Project."

The EA conclusions are:

The selected project plan would restore the Yalobusha River channel to its authorized 1953 construction flow capacity. Environmental impacts associated with this original flow restoration are not of the magnitude to warrant preparation of an EIS. *The project will result in some unavoidable adverse environmental impacts.* While *these unavoidable adverse impacts are not subject to mitigation since the project represents operation and maintenance work,* design consideration that would contribute to minimizing adverse impacts to the environment has been incorporated into the project.

(Emphasis supplied by the Court.)

### VI.

### CONCERNS OF OTHER AGENCIES

The Corps coordinated the development of the EA with the U.S. Environmental

---

11. An essential element of the FWS approach was the consideration of the effects of the myriad of Corps projects in the lower basin.

12. *Interim Report, Yazoo River Basin, Mississippi Lake Operations and Outlet Channels Reevaluation Report,* August 1987. This Corps report is discussed more fully in Appendix B, Section C.

Protection Agency ("EPA") and the U.S. Fish and Wildlife Service ("FWS"). Extensive comments were received from the Mississippi Department of Wildlife Conservation ("MDWC") and the Mississippi Wildlife Federation ("MWF"). The EA passed a state clearinghouse review with no objections.[13]

The EPA, FWS, MDWC, and MWF all disagreed with the Corps' determination that the project's destruction of wetlands in the Malmaison Sump was not "significant." This position was taken by the FWS before the proposal was complete and was repeated by every agency which addressed the question. Each agency also addressed specific omissions in consideration of the need for the project versus the alternative of no action. And, each agency objected to the initial reliance of the EA on supposed mitigation measures that were never built.

Both the FWS and the EPA objected to characterizations of the earlier EIS's which would allow this EA to rely upon them. The EPA was particularly concerned about the apparent basing of the FONSI on the unavailability of funds for mitigation in money budgeted for operation and maintenance. The EPA raised this issue several times, and ultimately agreed that the project was not subject to mitigation but that this determination did not reduce the adverse environmental impact. FWS proposed an extensive mitigation program which was rejected by the Corps. The EPA also suggested the use of hydraulic dredging to minimize impacts, but this was rejected by the Corps as too costly.

The MDWC was most concerned about the impact of the YRMP on fish in the River. The MDWC provided the studies on which the Corps based its EA discussions of the fisheries in the lower Yalobusha. In response to MDWC objections, the Corps recharacterized this language to show that the fisheries were recovering from past dredging. However, the State has continued to object to characterizations of the studies which present the River as a generally poor fishery.

13. A detailed discussion of the correspondence between the Corps and these agencies is provid-

## VII.

## CONTRACTING AND CONSTRUCTING THE YRMP

On April 20, 1988, the Vicksburg District awarded Contract No. DACW38–88–C–0052 to the Small Business Administration and its minority sub-contractor, Arrow Construction, Inc. ("Arrow"). That contract required Arrow to excavate 11.4 miles of the river bank, clear land, move 1,292,900 cubic yards of earth and complete stone work and turfing. The contract amount was $1,999,852.90. Work commenced on May 27, 1988, under the contract. As of August 18, 1988, 40% of the work had been completed, and $758,802.14 had been paid as of July 31, 1988.

## VIII.

## NEPA, THE CORPS, AND THIS COURT

### A. The National Environmental Policy Act

The National Environmental Policy Act, Public Law 91–190, 83 Stat. 852, codified at 42 U.S.C. § 4331, et seq. ("NEPA") was enacted by Congress in 1970. The purpose of that act is to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). Toward that end, Congress directed every agency of the Federal Government to

identify and develop methods and procedures, in consultation with the Council on Environmental Quality, which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.

include in every recommendation or report on proposals for legislation and other major Federal actions significantly af-

ed in Appendix A to this Memorandum Opinion and Order.

fecting the environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action
(ii) any adverse environmental effects which cannot be avoided should the proposed action be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332. Further, the responsible agency official was required to "consult with and obtain comments of any Federal agency which has ... special expertise with respect to any environmental impact involved" and to make copies of such comments available to the President, Council on Environmental Quality, and the public. *Id.*

■ The Council on Environmental Quality ("CEQ") has issued regulations, codified at 40 C.F.R. § 1500 *et seq.*, which interpret the NEPA guidelines more specifically. These interpretations are binding on the Corps.[14] Section 1501.3 of these regulations specifies that agencies "shall prepare an environmental assessment when necessary under the procedures adopted by the individual agencies to supplement these regulations." An EA is not necessary if the agency is preparing an environmental impact statement. An agency may decide not to do an EIS according to its own procedures, but that decision must be based either on a categorical exclusion or on a finding of no significant impact. 40 C.F.R. § 1501.4. A categorical exclusion is
a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no effect in procedures adopted by a Feder-

al agency.... *Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.*

40 C.F.R. § 1508.4 (Emphasis supplied by the Court.) A finding of no significant impact is a
document by a Federal agency briefly presenting the reasons why an action not otherwise excluded will not have a significant effect on the environment.... It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it.

40 C.F.R. § 1508.13.[15]

■ The most critical definitions furnished in the CEQ regulations are those for a "major federal action" and "significantly". A major federal action is an action with effects which are potentially subject to Federal control and responsibility.[16] "Significant" is a term of both context and intensity in NEPA. Significance varies with the setting of the proposed action and is based on effect upon a locale as much as effect upon the world as a whole. 40 C.F.R. § 1508.27(a). Among the ten factors listed by the CEQ to determine the significant intensity of a potential impact are:
(1) Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(3) Unique characteristics of the geographic area such as proximity to ... wetlands, wild and scenic rivers or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively signifi-

---

**14.** CEQ regulations bind other agencies as a matter of law. 40 C.F.R. § 1500.3. *See also Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir. 1985).

**15.** Environmental effect means environmental impact, and *vice versa.* 40 C.F.R. § 1508.8

**16.** 40 C.F.R. § 1508.18 "Major" reinforces but does not amplify significant. *Id.*

cant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27

## B. Corps Regulations

The Corps adopted regulations pursuant to 40 C.F.R. § 1507.3, specifically defining projects in its domain which normally require an EIS, which normally are within categorical exclusions, and which normally require an EA but not necessarily an EIS. These regulations appear at 33 C.F.R. § 230 et seq. Regulations promulgated in 1980 and 1981 [17] were in force throughout the period between the initial proposal of the YRMP in 1985 and the release of the final FONSI/EA on July 27, 1987. These regulations do not define project categories which are to be categorically excluded from NEPA review.[18] They do define actions which either normally require an EIS or normally require an EA but not necessarily an EIS. Section 230.6(d) describes Operation and Maintenance activities ("O & M" or "O/M") which "normally require the preparation of an EIS, although in certain cases an EA may be adequate:"

This category includes channel maintenance dredging and disposal activities, certain rehabilitation projects, the operation of dam and lake projects, lock and dam operations, aquatic plant control program[s] and significant changes in the management of lands and project resources.

Section 230.7(c) describes O & M which "require at least the preparation of an EA [19]:"

An [EA] [20] may be prepared to analyze changes in O & M activities including new disposal areas not discussed in the final EIS covering the O & M activity and for minor infrequent or once-only minor O & M activities, such as infrequent maintenance dredging and disposal operations, infrequent reservoir debris removal and post-flooding shoal removal operations, public use area modifications or relocations, habitat improvement projects, general plans, modifications to existing project structures and facilities and certain rehabilitation procedures.

Section 230.10 describes the requirements of a Finding of No Significant Impact. It is to be prepared by the District Engineer when

as a result of the analysis included in the EA, it is concluded that the proposed action will not have significant effects on the environment. The FONSI will be based on the information analyzed in the EA, reflecting pertinent data obtained from cooperating Federal agencies having jurisdiction by law and/or special expertise and the interested public. It shall briefly present the reasons why the action will not have a significant impact on the human environment and state why an EIS is not required....

The Corps restructured its NEPA review in regulations which became effective on March 4, 1988.[21] Under these regulations,

---

17. These regulations were first published at 45 Fed.Reg. 56,721, Aug. 25, 1980, and at 46 Fed. Reg. 14,745, March 2, 1981.

18. Although there are no provisions for categorical exclusions as a national regulation, Appendix B of 33 C.F.R. part 230, (7–1–87 ed.) allowed the availability of categorical exclusions in paragraph 7 if the district engineer had developed a supplemental list of categorically excluded project types. However, the Corps has not alleged that the district engineer has prepared such a list or that the FONSI/EA was based upon one.

19. Section 230.9 specifies the content and format of an EA and that the District Engineer is the "responsible official" required to evaluate project EA's under the CEQ NEPA regulations.

20. The Corps actually uses the initials "EP" at this place in the regulations. The Court reads this as a typographical error due to both the identification of this section as requiring an "Environmental Assessment (EA)" and the absence of any other definition of the initials, "EP".

21. These regulations were first published at 53 Fed.Reg. 22,3120, Feb. 3, 1988, and were codified at 33 C.F.R. parts 230 and 325, July 1, 1988 edition. They were intended to entirely replace earlier Corps regulations and were "to be used in conjunction with the CEQ regulation as a supplement." They do not purport to "modify the intent of CEQ regulations." 53 Fed.Reg. 22,3121.

actions which now require normally an EIS include:

(b) Proposed changes in projects which increase size substantially or which add additional purposes; and

(c) Proposed major changes in the operation and/or maintenance of completed projects.

33 C.F.R. § 230.4 (7–1–88 ed.).[22] Section 230.7 describes actions which now normally require an EA but not necessarily an EIS:

(d) *Construction and Operations and Maintenance.* Changes in environmental impacts which were not considered in the project EIS or EA. Examples are changes in pool level operations, use of new disposal areas, location of bank protection works, etc.

The greatest change in the new regulations is in the creation of service-wide CE's, in Section 230.9. This section provides

Actions listed below when considered individually and cumulatively do not have significant effects on the quality of the human environment and are categorically excluded from NEPA documentation. *However, district commanders should be alert for extraordinary circumstances which may dictate the need to prepare an EA or an EIS....*

(b) Activities at completed Corps projects which carry out the authorized project purposes. Examples include routine operation and maintenance actions, general administration, equipment purchases, custodial actions, erosion control, painting, repair, rehabilitation, replacement of existing structures and facilities such as buildings, roads, levees, groins, and utilities ...

(c) Minor maintenance dredging using existing disposal sites.

(e) All Operations and Maintenance grants, general plans, agreements, etc., necessary to carry out land use, development and other measures proposed in project authorization documents, project design memoranda, master plans, or reflected in the project NEPA documents.

(Emphasis supplied by the Court.) The comments to the rules emphasized that (c), the maintenance dredging exclusion, had been revised "to cover only minor actions using existing disposal sites." 53 Fed.Reg. 22,3123. This emphasis is illustrated in the deletion of a proposed CE for disposals of less than 50,000 cubic yards of dredge material in an upland (as opposed to wetlands) site. This was rejected due to the

difficulty in applying specific or limiting Corps-wide criteria for this type of placement. We agree that upland disposal site impacts may involve a broad spectrum of factors which are not readily ascertainable and should not be approved without review.[23]

*Id.* Critically, the new regulations do not provide that all projects that are categorically excluded from NEPA review are exempt from NEPA review. The language in Section 230.9 is amplified in the comments to the regulations:

We believe that the introductory paragraph to this section puts the district commander on alert for circumstances which may dictate the need for an EA or an EIS, and further, that categorical exclusion does not exempt an action from compliance with other Federal laws. While *the possibility exists that under certain conditions, an activity could cause a significant impact,* we believe that such circumstances would be extremely rare, would be recognized and would be treated as exceptions to the categorical exclusion. *Individual judg-*

---

**22.** The comments concerning this section in the Federal Register are enlightening:

It is important that the reader understand that the term "environmental assessment" describes not only a document, but is also considered a process by which impacts or effects of a proposed action are evaluated. This process is started at the outset of a proposed action ... and culminates in a determination whether an EIS or EA is required.

53 Fed.Reg. 22,3124

**23.** Another rejected exclusion would have exempted the construction of concrete structures and headwalls at intake and outfall pipes from NEPA review. This exclusion was denied "because the environmental sensitivity and potential impacts related to these types of actions should be evaluated through the EA process." 54 Fed.Reg. 22,3121.

*ment on a case-by-case basis,* as a result of the continuing environmental review process, *is still necessary when deciding whether an individual activity in a categorical exclusion grouping should have explicit documentation.*

*Id.* (Emphasis supplied by the Court.)

### C. The Corps Decisions

At the time of the completion of the Corps' review of the YRMP for conformity to NEPA, it reached an FONSI. It avowedly based this finding both on the coverage of the YRMP in earlier EIS's and on the accompanying EA, which found that environmental impacts associated with the project were present, were not subject to mitigation due to their character as operation and maintenance, but were "not of the magnitude to warrant preparation of an EIS." Final EA at EA–33.

The Corps now contends that the project is within the language of its regulations making it a CE.[24] The EA was prepared under Corps regulations effective prior to March 4, 1988. The FONSI will be evaluated under the regulations in force at the time of its issue. However, the Court finds that the prospective nature of the remedy sought by the Plaintiffs also requires consideration of the project under the new regulations, which would be applicable to any NEPA review that would commence under a continued injunction of YRMP construction.

### D. Political Question

◼ The Corps raises an initial objection to this Court's review of its decision by claiming that the Congressional authorization of the YRMP presents a political question and that the only recourse for the Plaintiffs is in Congress. However, the question presented by the Plaintiffs neither attacks the fitness of Congressional appropriations, nor requires that the Corps abandon a Congressional authorization. There is no element of a claim which is textually committed by the Constitution to another coordinate branch. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The question before this Court is whether the Corps followed the mandates of Congress in its decision-making procedure. An agency's decision to act without preparing an environmental impact statement is subject to judicial review. *Fritiofson v. Alexander,* 772 F.2d 1225, 1237 (5th Cir.1985). (Cumulative environmental impact study by the Army Corps of Engineers was insufficient to satisfy NEPA requirements.)

### E. The Scope of Review

There are two interrelated questions pending before the Court: (1) was the Corps acting illegally in making a finding of no significant impact? and (2) can the Corps assert that the YRMP is eligible for a categorical exclusion? The Court has been asked by Plaintiffs both to declare the decision not to prepare an EIS unlawful and to enjoin work on the YRMP until an EIS is completed. A review of the FONSI/EA is necessary to determine the aspect of unlawfulness. A determination of the necessity of any NEPA review under the current law is necessary to determine the fitness of the injunctive relief sought. The Corps has documented its finding in the administrative record and has asserted its claim of eligibility in argument before this Court. The Court now considers the standards by which it must assay these decisions of the Corps.

#### 1. Judicial Review: The FONSI

◼ The United States Court of Appeals for the Fifth Circuit has applied the "rea-

---

**24.** Although these regulations were not relied upon in the decision not to prepare an EIS, this omission does not preclude the Corps from raising categorical exclusion. CEQ regulations specifically allow the preparation of an EA at any time, whether required by the regulations or not. 40 C.F.R. 1501.3(b).

The position of counsel for an agency who presents an interpretation of a regulation may be accepted as the administrative determination of that agency. *American Telephone & Telegraph v. U.S.,* 299 U.S. 232, 241, 57 S.Ct. 170, 174, 81 L.Ed. 142 (1936). Even so, the Court takes notice that there is no record other than the briefs of counsel which would show careful consideration by the Corps of the advisability of defining the YRMP within a categorical exclusion.

sonableness test" in reviewing an agency's finding of no significant impact. *Louisiana v. Lee,* 758 F.2d 1081, 1083 (5th Cir. 1985), *cert. denied,* 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986).[25] Moreover, this Court must determine not whether the Corps reasonably determined that the YRMP "would not have" a significant impact; the Court must determine whether the Corps reasonably found that the YRMP "might not have" a significant impact on the human environment. *Louisiana v. Lee,* 758 F.2d at 1084. Thus the "plaintiffs must establish that the Corps was unreasonable in concluding that there was no reasonable possibility that the proposed action would significantly degrade any environmental factor." *Id.*

■ A FONSI may be unreasonable for one of at least two distinct reasons: the evidence before the Court demonstrates that, contrary to the Corps' finding, the project *may* have a significant impact *or* the agency's review of the project was flawed in such a way that it cannot be said whether the project may have a significant impact. *Fritiofson,* 772 F.2d at 1239.

## 2. Judicial Review: CE Classification and Corps Regulations

■ The Fifth Circuit has applied a more deferential test to review the determination of a project's fitness as within a categorical exclusion. *West Houston Air Committee v. Federal Aviation Administration,* 784 F.2d 702, 705 (5th Cir.1986). (FAA determination—that 558 signatures on a petition opposing project did not represent opposition by a government or "a substantial number of persons" in an area with a quarter million residents, so that a project was not removed from a CE—was not clear error.) By this standard, the Court will reverse the agency decision only if it is clearly in error.[26]

This Court must apply both standards, reasonableness in the review of the FONSI and clear error in the review of the claim of CE, in the light of general principles of the judicial review of agency regulation. Thus, between two potential interpretations of a regulation, the Court must choose an interpretation which comports with the statute over one which does not.[27]

---

**25.** The Court notes that there is a division between the Circuits as to the degree of deference which is to be shown to the agency's decision. The Second, Third, Ninth and Eleventh Circuits also apply the "reasonableness test." *See Sierra Club v. Corps of Engineers,* 701 F.2d 1011, 1030 (2d Cir.1983); *Township of Lower Alloways v. Public Service Electric & Gas,* 687 F.2d 732, 742 (3d Cir.1982); *Jones v. Gordon,* 792 F.2d 821, 827 (9th Cir.1986); *National Wildlife Federation v. Marsh,* 721 F.2d 767, 782 (11th Cir.1983). However, the District of Columbia and the Seventh Circuits apply an abuse of discretion standard. *See, Sierra Club v. U.S. Department of Transportation,* 753 F.2d 120, 126 (D.C.Cir. 1985); *River Road Alliance v. Corps of Engineers,* 764 F.2d 445, 449 (7th Cir.1985) *cert. denied* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). There is some question as to how different these standards truly are. *River Road,* 764 F.2d at 449. However, even if the Court were to apply the stricter standard in lieu of "reasonableness," the result would be unchanged. The Court applied the highly deferential standard in the review of the significant impact element of the categorical exclusion claim, and yet could not find for the Corps.

**26.** This standard is obviously similar to that employed by the D.C. Circuit in evaluating an administrative decision to avoid an EIS. *Sierra Club,* 753 F.2d at 127. That standard is decom-

posed into four criteria: the agency must have accurately identified the relevant environmental concern; it must have taken a "hard look" at this concern in its NEPA review; if the agency determines that the project does not require NEPA review, it must be able to make a convincing case supporting such a finding; and if the agency does find an impact of true significance, preparation of an EIS can be avoided only if changes or safeguards in the project sufficiently reduce the impact to a minimum. *Id.*

**27.** When interpreting statutes and regulations, the plain language of the statute or regulation controls, absent clear intention to the contrary. *Oliver v. U.S. Postal Service,* 696 F.2d 1129 (5th Cir.1983). While the agency's interpretation of an enabling statute and its regulations is given great deference, *Penzoil v. F.E.R.C.,* 645 F.2d 360 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982), the agency's interpretation must be set aside if it is unreasonable or inconsistent with the statute it interprets. *PPG Industries v. Harrison,* 660 F.2d 628 (5th Cir.1981). Therefore, the Court will choose from between available meanings of a regulation a meaning which comports with its enabling statute over one which does not. *See, United Telecommunications v. Commissioner,* 589 F.2d 1383, 1390 (10th Cir.1978) (interpreting tax regulations).

## IX.

### THE REVIEW OF THE CORPS DECISION

#### A. The Reasonableness of the FONSI

An implicit basis of the FONSI is found not in the FONSI, but in the EA conclusions: "Environmental impacts [of the YRMP] are not of the magnitude to warrant preparation of an EIS." There are only two announced rationales in the FONSI: previous EIS's had adequately described the O & M "aspects of this project"; and mitigation measures of the Yazoo Headwater Project "were authorized to mitigate projected adverse environmental impacts" of the YRMP.

#### 1. The Impact of the YRMP

 The YRMP is a $4 million project to dig over one million cubic yards of dirt from the bottom and sides of the Yalobusha River and dump that dirt on the banks and on forty acres of wetlands; the river width will be increased by fifteen feet at most places.[28] As a result, one-twelfth of a rare wetlands complex will be destroyed, and tons of sediment will enter the Yazoo River.[29] The U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, the Mississippi Department of Wildlife Conservation, and the Mississippi Wildlife Federation each opined to the

Corps that this loss of wetlands was a "significant impact" within the meaning of NEPA.[30] This is the primary contention of the Plaintiffs and Intervenors in this case. Only the Corps seems to hold otherwise.[31] While the Corps was not obligated by its regulations to accept the interpretations of coordinating agencies, the opinions of state and federal agencies with expert knowledge in the field will not be lightly regarded. They must be given a "hard look" by the Corps, as by this Court.

The Council on Environmental Quality described three separate factors, any of which could demonstrate significance in this project: proximity to wetlands, controversy over the environmental effects of the project, and likely relation to other projects which would create a cumulatively significant impact. The regulations of the Corps in effect at the time of the FONSI list channel maintenance dredging and disposal activities (presumably on a smaller scale than the YRMP) among O & M work which would normally require preparation of an EIS.

The Court finds as a matter of fact that, contrary to the Corps finding,[32] the Yalobusha River Maintenance Project may, if not will, have a significant impact on the human environment by the reduction of the available wetlands of the Yazoo Basin.

---

**28.** The YRMP is not a large project when compared with other projects of the Army Corps of Engineers. But the significance of an environmental impact is to be judged according to each case, not merely according to comparisons of acreage or dollar cost.

**29.** The Corps stresses in the EA that this wetlands area would not exist if it had been timely in its maintenance in 1973. However, the area was wetlands before the age of flood control and became wetlands again following natural reclamation. NEPA reviews are of the impact to the environment as it exists, regardless of its ultimate cause. Reference in the EA to the "dividends" to wildlife which would be lost were both irrelevant and misleading. The Court applies the state of the environment in 1987 as the baseline for the measurement of impacts.

Although flooding in the Malmaison Wildlife Management Area would not be excessively reduced, the Sump includes a much larger area than the W.M.A. It is disingenuous of the Corps to suggest that there is a lesser impact to the human environment according to whether the

Corps, the State of Mississippi, or private citizens hold the fee.

**30.** The occasional omission and mischaracterization of agency comments in the coordination of the EA is chronicled in Appendix A to this Memorandum Opinion and Order. The most obvious of these are the dispute over the actual meaning of data accumulated by Ron Garavelli describing fish population in the lower Yalobusha, the omission of acreage lost to channel widening, the utility of the mitigation measures (whether in place or proposed), and the significance or insignificance of the loss of wetlands.

**31.** Despite the ultimate determination of the District Engineer, the response of the Mississippi River Commission to the FWS report would indicate that the Corps was not unanimous in its decision.

**32.** "Environmental impacts associated with this original flow restoration are not of the magnitude to warrant preparation of an EIS." EA–33.

Further, the Court finds that independently significant impacts may exist either from the increased sediment flow to the Yazoo River or the disruption of the Yalobusha River from dredging of this scale.[33] The Court finds that the YRMP may also cause cumulative impacts to the human environment, which would be significant due to joint operation of other activities of the Corps in the Yazoo Basin. Alternatively, the Court finds that there was insufficient evidence in the record to support a finding that the impacts of this project would not be significant within the meaning of NEPA and that a decision such as that on page EA–34 is therefore not reasonable.

### 2. Reliance on Prior EIS's

Initially, the Corps maintained the YRMP had not been "specifically covered" by any prior EIS. Sometime between the September 12, 1986, public notice and the February 6, 1987, draft FONSI, the District Engineer decided that the O & M aspects of the YRMP had been "adequately covered" in two earlier EIS's.[34] These Environmental Impact Studies were not identified in either the FONSI or the body of the EA.[35] Before this Court, the Corps has claimed that the *Final EIS, Flood Control, Mississippi River and Tributaries, Yazoo River Basin, Mississippi,* issued September 1975, and the *Final EIS, Operation and Maintenance, Arkabutla Lake, Enid Lake, Grenada Lake and Sardis Lake, Missis-*

*sippi,* issued August 1978, are the EIS's described in the FONSI.[36]

■ In *U.S. v. 162.2 Acres,* 733 F.2d 377 (5th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 920 (1985) the Fifth Circuit held that an agency may choose whether NEPA documentation for a project will be programmatic or site specific. As long as the agency provides the necessary depth of analysis, the choice is within the agency's discretion. In that case, a Supplemental EIS ("SEIS") of the Tennessee–Tombigbee Waterway had adequately provided "indepth attention to the unique archeological and architectural features" of a site being condemned under the project. This analysis was accomplished by incorporating exhaustive studies of the site resources by reference into the SEIS, as well as by detailing recurring adverse impacts on fish and wildlife.[37]

Here, one long paragraph in the 1978 EIS generally describes a variety of unpleasant effects to the environment which may be caused by the "continual snagging, clearing ... and channelization of stream channels", including lowering groundwater levels in marshes and wetlands. However, there is no consideration of the effect of channelization which occurs after thirty years of neglect, nor is there a consideration of the degradation to the human environment that maintenance dredging would

---

**33.** Dredging and channel improvements may obviously have a significant impact separate from the original channelization. The Tippo River rechannelization would have been similar to the YRMP in size and purpose, although the Tippo maintenance would have occurred much closer in time to the original dredging. It was found to be a major federal action which would significantly affect the human environment. *Sierra Club v. Bergland,* 451 F.Supp. 120, 129 (N.D.Miss.1978). *See also Wisconsin v. Callaway,* 371 F.Supp. 807 (W.D.Wis.1974) in which the court found that annual maintenance dredging of ⅔ of the YRMP amount of fill was a significant impact to the human environment. This comports with the decision to delete a proposed CE for dredging projects of 50,000 cubic yards of less, discussed in Section VII.B. above.

**34.** These EIS's are discussed in greater detail in Appendix B to this Memorandum Opinion and Order.

**35.** The EA identifies the 1978 EIS, but only in the coordination section of the EA, responding to EPA criticism that the 1978 EIS does not adequately cover the YRMP.

**36.** The Court notes that projects which are separate, even if closely related by geography and function, will require separate NEPA evaluations. *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir.1974). The Court does not consider or decide whether the YRMP is really a separate project from the studied projects due to its determination that those studies would be inadequate whether applied to the YRMP or not.

**37.** A similar standard of discretion applies to a decision to supplement an existing EIS to accord to new environmental characteristics. *Louisiana Wildlife Federation v. York,* 761 F.2d 1044 (5th Cir.1985) (agency decision not to supplement a four-year old EIS covering the same project was not clear error.)

pose by destroying wetlands now used by migratory waterfowl and resident animal life. There is no discussion of the effects of maintenance dredging on fisheries in rivers that are in a "recovery phase" from earlier dredging. These same omissions occur in the 1975 EIS.

Merely describing the environment of a site does not describe the impacts of a specific project at that site.

 There is no question that the regulations of the Corps contemplate at least occasional need of an EIS for maintenance dredging. The mere existence of a project, and therefore its NEPA documentation, cannot serve as *prima facie* evidence that the impacts of maintenance dredging have been fully evaluated under NEPA. There is insufficient analysis of the impacts in the Yalobusha River area, direct or by reference, in the 1978 or 1975 EIS's to contain the level of analysis for the impacts of this project required by NEPA.[38] The Court therefore finds that there was insufficient site-specific analysis in these studies for the Corps to rely upon them in a finding that the YRMP would have no significant impact to the human environment.[39] The Court finds further that the reliance on insufficiently identified or described EIS's to support a Finding of No Significant Impact was flawed in such a way that it could not be said from the FONSI or the EA whether the project may have a significant impact.[40]

### 3. Reliance on Mitigation

 Design changes in the project, or specific programs of mitigation, may re-

duce the impact of a given project below the threshold of significant. *Sierra Club*, 753 F.2d at 127. However, unless mitigation is included in the project design and is related to the impact to be created by the project, mitigation which is potential or which reduced the effect of impacts from other projects has no effect in reducing the impact of the project at hand below a significant level.

The original design of the YRMP was altered by restricting construction to one bank. However, this does not affect the larger impact of the lost wetlands or dredging. There is considerable disagreement over the mitigation measures authorized for the Yazoo Headwater Project which were "authorized to mitigate projected adverse environmental impacts associated with ... operation, and maintenance." The EPA, FWS, MDWC, and MWF each maintained in the EA process that these mitigation structures were largely unbuilt, were generally inadequate, and had little effect in the Malmaison Sump. At best, language in the EA which describes mitigation measures that were not built is misleading. Language in the FONSI which is based on a decision that "the adverse environmental impacts of this project are not subject to mitigation since the project represents maintenance work" merely describes limitations in the structure of the Corps budget; this is irrelevant to the significance of the impact of the YRMP on the human environment. The Court finds that no mitigation is included in this project which would reduce the impacts of the YRMP below significance. Further, the Court

---

**38.** Original dredging of the Yalobusha below Grenada Dam was completed fifteen years prior to NEPA. Therefore, no NEPA documentation of the original project exists. The EPA and the FWS both objected to Corps reliance on the 1978 EIS as insufficiently site-specific.

**39.** While this project could have been properly reviewed by a supplemental EIS, had one been prepared, the decision which was made was to generate a separate FONSI based on an EA. The Court will not review a decision the Corps might have made in the face of a petition to judicially review a decision actually made. Even so, the Court makes clear both that the Plaintiffs have raised a significant environmen-

tal issue and that the Corps did not act reasonably in its characterization of YRMP impacts in the face of earlier EIS's. The YRMP impacts were significant and separate from those described in the earlier studies.

**40.** The Corps has clarified the meaning of its earlier pronouncement that the YRMP was not "specifically covered" in earlier EIS's to mean that the "impacts of the maintenance work on the Yalobusha River are not segregated from the remainder of the overall project work for treatment in an individual EIS." However, the essential question in the review of an FONSI remains, "was the FONSI reasonable?"

finds that any reliance of the FONSI on exemption of the YRMP from mitigation requirements due to its status as an O & M project was therefore unreasonable.

In summary, the Court finds that the Finding of No Significant Impact was unreasonable.

### B. The Error of Categorical Exclusion

■ Although the designation of the YRMP as being in a categorical exclusion is given great deference by this Court, this designation is clearly contrary to law. There are two bases for this decision: not only did the YRMP not come under the definition in the regulations of project types that are categorically excluded, but also, had it been so defined, it would have been excepted from the exclusion by the regulations.[41] The Corps submits that exclusions (b) and (c), described in Section 230.9, describe the YRMP.[42] Exclusion (b) includes "routine" O & M at completed Corps projects, and (c) includes "minor maintenance dredging." 1,292,900 cubic yards of dredge spoil from a widened river, dumped into wetland disposal sites last used thirty years ago is neither routine nor minor, particularly in light of the decision of the Corps not to exclude disposals of 50,000 cubic yards of dredge spoil in non-wetlands, because such projects may involve a "broad spectrum of environmental or other factors."[43] The Court finds that the characterization of the YRMP as within the definition of categorically excluded projects under its regulations was clear error.

Even if the regulation did define categorical exclusions to include the YRMP, the District Commander would have clearly erred in not treating the YRMP as an exceptional case. Categorical exclusions generally are types of projects which do not individually or cumulatively have significant effects on the human environment.

In order to prevent a project within such a type from being excluded if it, in fact, does have such an impact, the District Commander is to be alert to this possibility and is to prepare an EIS or EA as appropriate. 33 C.F.R. § 230.9 (9–1–88 ed.); *West Houston Air Committee*, 784 F.2d at 705. *See also Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir.1986) (National Marine Fisheries Service was unreasonable in failing to apply exception to categorical exclusion to NEPA in issuing permits to capture killer whales). The Court has found overwhelming evidence in the administrative record that the Corps made a clear error in finding that there was not a significant impact by the YRMP. The Court therefore finds in the alternative that it would have been clear error not to except the YRMP from Corps regulations categorically excluding the YRMP from NEPA review, had these regulations so applied.

The language of NEPA requires that the proposals for the YRMP conform to its terms. A contrary Corps regulation exempting the YRMP, a major Federal project which will significantly impact the human environment, through categorical exclusion would have to be set aside. When alternative interpretations of a regulation exist, the Court will apply that interpretation which upholds the validity of the regulations, as it does today.

In summary, the Court finds that a characterization of the YRMP as categorically excluded from environmental assessment under NEPA is clearly erroneous.

### X.

### THE NATURE OF THE REMEDY

■ Based on its findings today, the Court balances the equities between continuing its injunction of work on the YRMP and lifting the injunction to allow general

---

**41.** Since a determination that a project is categorically excluded from NEPA documentation would obviate the need for a detailed NEPA review, it is rare that a Court will have the luxury of comprehensive environmental data in the judicial review of such a decision. However, that is the case today. The Court applies the available administrative record in its review of the categorical exclusion.

**42.** The Corps regulations are more fully set out and described in Section VIII, part B, above.

**43.** 53 Fed.Reg. 22,3123, Feb. 3, 1988.

completion of the project. The Court has already modified its injunction to allow removal of debris.

Were the Court to make its injunction permanent, it would last only so long as the Corps would require to prepare an adequate Environmental Impact Statement. The Court notes that the Corps will have the discretion to prepare a site-specific EIS for the YRMP or develop a broader EIS or SEIS, any of which would adequately present the environmental concerns to the public and decision-makers. The vast majority of the data acquisition for either task is complete. The YRMP EA, the LOOC study, and the YRB Mitigation Study contain exhaustive data on the region and its unique environment.[44] In light of an appropriate EIS, Congress and the Corps may elect either to continue the project or discontinue construction permanently. Therefore, the Court is of the opinion that there will not be a great delay in the Corps' preparation of an EIS and that the equities balance in favor of the Plaintiffs' concern for the harm to the environment.

## XI.

## SUMMARY

The language of NEPA and the regulations of the CEQ and of the Corps provide that an environmental impact statement is to be prepared when a major Federal project significantly affecting the quality of the human environment is being developed. The Court today finds that the YRMP is a major Federal project which will significantly affect the quality of the human environment. In reaching this finding, the Court has been careful not to substitute its judgment for that of the Corps. It has instead relied upon evidence in the record compiled by the Corps and found the finding of no significant impact to have been based both on unreasonable decision-making and on an unreasonable interpretation of the available data. Further, the

Court finds that the Corps is clearly in error when it claims that the YRMP falls within a categorical exclusion to NEPA. The explicit language of the Corps' own regulations limit such exclusions to "minor projects," which the YRMP is clearly not. Therefore, the Court will continue its current injunction, and make it permanent until such time as the Corps completes a full and adequate environmental impact statement.

IT IS THEREFORE ORDERED that the decisions of the Defendants that the Yalobusha River Maintenance Project will have no significant impact on the human environment are set aside as contrary to law.

IT IS FURTHER ORDERED that the injunction of this Court enjoining the Defendants from further planning, financing, contracting or constructing elements of the Yalobusha River Maintenance Project, as limited by the Court on November 21, 1988, is continued until such time as the Defendants have completed an Environmental Impact Study which conforms to the requirements of the National Environmental Policy Act, but this injunction shall not reach to planning and financing necessary to comply with the National Environmental Policy Act.

SO ORDERED.

## APPENDIX A

## CORRESPONDENCE BETWEEN THE CORPS AND OTHER AGENCIES

A. THE ENVIRONMENTAL PROTECTION AGENCY.

On October 14, 1986, the United States Environmental Protection Agency ("EPA") responded to the public notice of the Yalobusha River Maintenance Project in a letter to Col. Stevens. In that letter the EPA raised two concerns:

First, we feel that the activity as proposed is contrary to Section 404(b)(1) Guidelines....

---

**44.** An EIS does not need to be encyclopedic, although it should be intellectually honest in its appraisal of impacts, the need for the project, and consideration of alternatives. The Court notes that it did not reach the sufficiency of the consideration of alternatives in the EA, but this consideration should not be based as much on the weight of the hammer as the need for the nail.

The second associated concern which we feel must be addressed is the destruction of a minimum of 150 acres of bottomland hardwoods and the potential for an additional 145 acres of regenerating bottomland hardwoods to be significantly altered. The public notice indicates the project is not covered by any previous Environmental Impact Statement (EIS) and that an Environmental Assessment will be prepared. *This agency considers the loss of this magnitude of bottomland hardwood habitat as being immediately significant.* We have discussed the generic issue of the significant impact federal projects are having on this vegetation type with you and your staff on previous occasions. *The overall effects that the increasing losses of bottomland hardwoods are producing in the Lower Mississippi Valley have become a matter of national concern.* Therefore, we recommend that the project be evaluated within a spectrum of alternative designs.... In view of the anticipated impacts from this project, a full evaluation within the context of an EIS may be in order.

(Emphasis supplied by the Court.)

The letter suggested an interagency meeting to further consider the possibility of an EIS and was signed by the Regional Administrator for EPA, Jack Ravan. In a letter dated December 2, 1986, the EPA further advised Col. Stevens that the EPA had conducted a field investigation by helicopter.

We are now convinced the environmental losses occasioned by this project in its current design can only be appropriately addressed within the context of an environmental impact statement (EIS). With this in mind we are compiling a list of subject matter topics within the Environmental Protection Agency's (EPA) area of expertise which should be examined/evaluated in this document ...
*EPA's decision to request an EIS is based on* the primary and induced impacts of this particular proposal as well as *the national significance of the affected bottomland hardwood resource.* Further, the importance of this issue, in

our opinion, warrants more comprehensive public input in the decision-making process on the permit. We learned from your staff that this public notice is just a portion of a larger effort known collectively as the lakes operation/outlet channels project. Since stream sedimentation is such a comprehensive problem in the Yazoo Basin, *the significant losses of bottomland hardwood habitat associated with this facility should not be viewed in isolation.*

It should be noted that our views regarding the more detailed evaluation are predicated on the currently proposed method of channel excavation. It is quite possible that another structural design to achieve flood control, e.g., hydraulic dredging to upland spoil disposal sites, could, in fact, be addressed by an environmental assessment. While the end result, i.e., altering the hydroperiod, would be the same, the environmental consequences appear to be considerably less damaging than from using a dragline. It was indicated that net benefits might be adversely affected if a hydraulic dredge were used. We understand that costs are always a very central factor in how Corps' projects are accomplished. However, since it appears that dredging activities are a relatively common occurrence in the basin, the excess costs of using hydraulic equipment could be lessened by combining a number of these maintenance projects.

> (Signed) E.D. Heinen
> E.D. Heinen, Chief
> Marine and Estuarine Branch
> Water Management Division

(Emphasis supplied by the Court.) In a letter dated January 13, 1987, the EPA again addressed the method of channel deepening. The language of this letter apparently contradicts the letter above.

[I]n conversations ... about the trade-offs between hydraulic pumping of material to upland sites versus side-casting material adjacent to the river with a dragline ... an EIS would almost certainly be necessary for the former dredging method while an assessment/FONSI

appear adequate for the latter technique.... it would be prudent to examine the significant aspects of the Yalobusha proposal in the context of the overall undertaking. This is particularly important since we want to avoid any implication that the environmental losses are being examined in a piecemeal fashion.... The alternative section of the NEPA document should fully compare/contrast the environmental, societal, and economic implications of the mentioned excavation techniques and combinations thereof ... Nonstructural measures should also be assessed ...

This order was signed by Gerald Miller for Sheppard N. Moore, Chief, NEPA Review Staff.

The Corps summarized these letters as five comments in its draft EA. The comments were directed toward (1) the nature of the dredging method, (2) the relationship of the YRMP to the larger basin work, (3) bank instability, (4) expansion of the alternatives section, and (5) the relationship between construction and maintenance work. The Corps responded to comment (1) with a position that:

an Environmental Assessment/*FONSI represents the proper NEPA documentation* for this action *because operation and maintenance was covered in a final Environmental Impact Statement* (EIS) for Arkabutla Lake, Enid Lake, Grenada Lake, and Sardis Lake, Mississippi, dated August 1978. Anticipated impacts from conducting channel operation and maintenance on the Yalobusha River were discussed in the final EIS for the Yazoo Basin Project which was filed with Council on Environmental Quality on 29 December 1975. *Further, hydraulic dredging does not represent a cost-effective means of accomplishing the work.* The cost of performing this work by dragline versus hydraulic dredge is $2,250,000 and $4,325,000, respectively, with no appreciable increase in environmental benefits.

(Emphasis supplied by the Court.) The Corps responded to comment (2) by noting that the YRMP includes maintenance work

in the reach from mile 0.8 to mile 12.2 designed to bring channel capacity up to that of the remainder of the river from mile 12.2 to Grenada Lake. The area from mile 11.6 to mile 21.4 is being studied under Lake Operations and Outlet Channels. Comment (3) was answered by noting that

The Corps of Engineer recognizes that bank instability is a contributor to the sedimentation problems. This and other efforts; i.e., the Demonstration Erosion Control Program, are being aimed at reducing the loss of soil in the Yazoo Basin.

The Corps responded to comment (4) by noting that "The discussion of the selected plan and alternatives was structured to fully respond to this comment." The Corps noted in response to comment (5):

As part of the Yazoo Headwater Project, authorized construction has already taken place on this project. The proposed work would merely restore the channel to its capacity at construction. Also, operation and maintenance funds will be used to accomplish construction. *Corps policy permits operation and maintenance funds to be used only for authorized operation and maintenance purposes; therefore, these funds cannot be expended for mitigative aspects of this project.*

(Emphasis supplied by the Court.) Following the release of the February FONSI/EA, the EPA responded in a letter dated March 19, 1987. The six-page, single spaced letter to Mr. Ahlrich of the Corps Planning Division, stated:

... we determined that the *information contained in this and previous COE documents is insufficient to support the proposed "Finding of No Significant Impact" for this action.* This proposal is a constituent element of a project formulated over fifty years ago. During that period subsequent Congressional authorizations have enlarged the scope of the initial, more limited facility to the point that the original functioning of the water resources of the entire Yazoo Basin (the Delta) has been materially altered. In the main these changes have

been accomplished in a compartmentalized fashion to accomplish often conflicting goals and with an imprecise knowledge of their cumulative/induced impacts.

Interestingly, this fact has not escaped the notice of your Division's water resources planning staff. Over 15 years ago COE documents observed that because of economic changes, drainage improvements, and the unprecedented growth of soybeans as a major crop, woodlands and wetland habitats have been extensively cleared throughout the Delta. These changes to the natural environment, along with flood control and drainage improvements of other agencies, have considerably affected the existing Yazoo Basin project. Specifically, the changes in land use and runoff characteristics have caused a marked increase in peak flows, resulting in outlet channels exceeding their bankfull capacity with increasing frequency.

*The text of this EA contains an excellent example of how inaccuracies/data gaps on both specific elements and the comprehensive overview of a project can become institutionalized.* In the District's response to comments EPA previously made on the level of environmental evaluation necessary to determine the primary and secondary impacts of the project and hence, the type of environmental document, it was indicated that the operation/maintenance (O/M) was covered in the Final Environmental Impact Statements (FEIS) on Arkabutla Lake, Enid Lake, Grenada Lake, and Sardis Lake. *In fact, the only mention of O/M we discovered was a general treatment of how, why, and where stream channelization had been employed in the basin together with an excellent overview of why this practice is so devastating from an environmental perspective.*

It is apparent that this overview covered the subject O/M, but in our estimation Section 102(2)(C) of the National Environmental Policy Act (NEPA) had perhaps a somewhat greater level of specific insight in mind....

[T]he anticipated environmental consequences of O/M on this particular reach of the Yalobusha River were noted to have been discussed in the Yazoo Basin Project EIS. Once again *the only discussion we noted was a chronology of the structural measures which have been completed or are planned on the Yalobusha together with a generic treatment of how O/M is accomplished. It was noted that additional detailed site specific evaluations for specific project features would occur when design studies produced the requisite data.* Now, interestingly enough the superficial treatment of the proposed action in this EA is justified on the basis that a detailed assessment was previously made; however, from our perspective this has not been accomplished.

EPA is certainly sensitive to the differential in cost between dragline and hydraulic excavation for the subject O/M.... there is considerable doubt in our minds about the contention that there would be no appreciable increase in environmental benefits by the use of the latter technique with upland disposal. When a dragline excavates the proposed bench channel wider on alternate sides of the river, extensive riparian habitat will have to be sacrificed just to access the work site together with the travel lanes and bank disposal areas. *We assume that financial considerations were primary among the compelling factors to use a dragline, but this decision undervalued its direct impacts to the natural environment* and there was no discussion of the induced societal/economic consequences.

For example, as is all too often the case, the environmental losses occasioned by this work are viewed in isolation of previous similar perturbations or discounted by the observation that the river's natural functioning is already stressed by past activities.

The EPA then raised a number of specific omissions in the EA.

These are issues which should be addressed now rather than in an after-the-

fact manner when shortcomings in the evaluation become apparent, solutions [are] much more costly to implement and health/safety factors come into play. The stability problem being experienced on Twenty-mile Creek in the northwestern part of Mississippi speaks volumes against the "act now—evaluate later" method of providing flood control protection.

It was indicated in the EA that 2900 acres of land adjacent to the subject reach currently flood.... There should be a breakdown of acreage flooded by existing (not potential) land use and season of incidence together with a comparison of episode duration.

We understand that mitigation is not required for maintenance work. The basis of this premise is the design of the original project should have been accomplished in an environmentally sensitive manner. Further, any unavoidable losses would be mitigated by discrete features such as water control structures, land purchases, etc. In reality, many of the constituent structural elements of the Yazoo Basin project were formulated/constructed at a time when environmental considerations were only nominally factored into the planning process. Unfortunately, more recent projects which did have specific line item mitigation features have failed to provide the intended environmental sensitivity since these features were either subsequently eliminated or deferred indefinitely. Those environmental features which were implemented are now being credited as the mitigation for multiple structural measures throughout the entire Delta. From our perspective the environmental losses are far in excess of the ability of the limited number of mitigation features to accomplish their purpose. In the absence of specific evidence to the contrary it is our opinion that the mitigation features listed in paragraph 22 of the EA do not, in fact, mitigate for the O/M of this reach of the Yalobusha to the degree stated.

We currently have sufficient information to persuade us that the subject EA does not warrant the tentatively assigned "Finding of No Significant Impact."

The Corps held a workshop on the YRMP with a variety of state and federal agencies on May 5, 1987. Representatives from the EPA, U.S. Fish and Wildlife Service, Mississippi Department of Wildlife Conservation, Mississippi Bureau of Pollution Control and Army Corps of Engineers met and reviewed a variety of concerns. Representatives of the EPA again raised their concerns as to water quality, wetland loss, a lack of information on flow-lines, soil stabilization, and quantity losses, and raised concerns on habitat loss of bottomland hardwoods.

In its final EA and FONSI, issued on July 27, 1987, by Col. Pat Stevens, the comments and responses are essentially unchanged from those in the earlier EA and FONSI. No coordinative consideration seems to be given to any of the concerns raised by the EPA during the interim. However, the text of the EA does more specifically delineate the distinctions between the LOOC study and the YRMP. It also details the dollar value estimates of damage to the environment taken from the UYB Mitigation Study.

In a letter from the EPA dated August 27, 1987, the EPA noted that the final EA "provides a much more comprehensive overview of the environmental consequences of the proposed action" than previous iterations.....

Upon reflection it appears that the project issues which remain outstanding are basically of a conceptual nature. That is, the "restoration" of the Yalobusha River between river miles 0.8 and 12.2 to the authorized channel capacity will be accomplished without any environmental mitigation. *There will be very obvious adverse environmental ramifications attendant to increasing flow capacity, but because this is a maintenance undertaking it is not subject to mitigation.* From our viewpoint *this stipulation is becoming increasingly perplexing.* An examination of the list of projects related to this action amply attests to why we are concerned....

The large number of constituent elements in the Yazoo Headwater Project speaks to the comprehensive impact of man's activities in the basin.

Each construction item should not be viewed in isolation when, in fact, it is merely part of the much larger whole.

(Emphasis supplied by the Court.)

## B. THE U.S. FISH AND WILDLIFE SERVICE

The U.S. Fish and Wildlife Service first contacted the Corps in relation to this project on June 16, 1985. FWS sent a letter and report designed to assess impacts of the proposal and to identify and recommend means of "conserving the high quality fish and wildlife resources of the area, especially those of the Malmaison Sump." The report was prepared with the Mississippi Department of Wildlife Conservation and was sent with their concurrence. The letter noted that flood control problems currently exist in the river south of Grenada Lake which damage agricultural lands above the reservoir, which cause flood damage on high risk croplands downstream, and which decrease protection of higher agricultural lands and urban lands downstream. The FWS also noted declining productivity in the reservoir's fishery, declining productivity in both downstream fisheries, wildlife habitat within the reservoir takeline, disruption of federal/state migratory waterfowl management programs, destruction of hardwood wetland habitat, and unwise use of floodplain lands. FWS stated then that

The proposed maintenance project would be damaging to fish and wildlife resources. The project would result in loss of 51 acres of forested wetland habitat in the right-of-way, induced clearing of 686 acres of bottomland hardwoods, reduction of overbank flooding, reduction of 1,308 acres of average annual acres flooding during the waterfowl season, and adverse impacts to the State/Federal wildlife management programs.

The project, as planned, is environmentally unacceptable because the proposal does not include a mitigation plan to offset the high project induced losses, does not address the serious flood control and fish and wildlife problems, and does not include measures to preserve project efficiency. To address our concerns, the Service has recommended several measures which include the following:

1. Acquire flowage/environmental easements on approximately 25,100 acres of land in the Malmaison Sump to restore project effectiveness and address problems.

2. If item (1) is not accomplished, acquire 3,265 acres in fee title to mitigate the loss of forested wetlands.

3. Install water control structures to mitigate waterfowl losses.

4. Lower the rule curve for Grenada Lake to revegetate mudflats/dead vegetation areas and allow use of waterfowl subimpoundments.

The Corps' response was to note in its proposal that an environmental assessment would be done. This replaced earlier language noting that either an environmental assessment or an environmental impact statement would be done.

FWS responded to the public notice in a letter to Col. Stevens on October 1, 1986. That letter described the YRMP and the draft report on the LOOC study. FWS noted that

[t]here are numerous flood control and fish and wildlife problems which exist in the project area. These problems ... are closely allied to two basic reservoir operational policies: (1) regulation of Grenada Reservoir "in an effort to minimize flooding from any rainfall event regardless of the time of year in which it occurs" and (2) regulation of the reservoir in an effort to protect high risk agricultural land (cleared wetlands) from seasonal rainfall.

The YRMP would impact the approximately 54,400–acre Malmaison Sump, which is situated below Grenada Reservoir.... Consisting of approximately 31,000 acres of forested wetlands, 2,400 acres of oxbow lakes, and 21,000 acres of cleared wetlands, the Malmaison Sump is the most extensive forested wetland com-

plex in the upper Yazoo Basin and is the best waterfowl wintering area in Mississippi. The importance of the area has been documented in the Corps' 1980 *Yazoo Basin Environmental Inventory* and in the Service's *Bottomland Hardwood Preservation Program.* The Project would result in adverse impacts to forested wetlands, winter hydrology essential to waterfowl wintering habitat, and fisheries of the river and oxbow lakes. These impacts are discussed in detail in our July FWCA report on the LOOC Study.

*The Service objects to the proposed project unless the Corps acquires in the Malmaison Sump a 1,542–acre mitigation area of approximately 75 percent bottomland hardwoods and 25 percent openland to mitigate project impacts* and partially address the serious fish and wildlife problems.

The Corps has not included mitigation measures ... the Fish and Wildlife Service recommends that the subject permit be denied unless the previously recommended mitigation feature outlined above is included as a condition of the permit.

(Emphasis supplied by the Court.) In its February 6, 1987 FONSI/EA the Corps summarized this objection as two comments. Comment one was summarized as the "YRMP would impact *the approximately 34,000–acre Malmaison area.*" The Corps' response was that "Corps hydrologists indicate that the proposed operation and maintenance work on the Yalobusha River Channel will have minimal, if any, adverse impacts to the *Malmaison WMA.*" (Emphasis supplied by the Court.) The Corps summarized the remaining comment as "The Service objects to the proposed project unless the Corps acquired in the Malmaison area a 1,542 acre mitigation area of approximately 75% bottomland hardwoods and 25% openland to mitigate project impacts and partially address the serious fish and wildlife problems." The Corps response was that both the 15,000 acre Hillside National Wildlife Refuge and two water control structures were authorized for mitigation of the projected ad-verse environmental impacts associated with the construction, operation and maintenance of the Yazoo Headwater Project and that mitigation requirements for this project have been satisfied. The Corps claimed it could not spend O & M funds except for work required to operate and maintain the integrity of the previously constructed project. "To acquire lands for any purpose other than those needed to perform operation and maintenance work would require an act of Congress."

FWS responded to the initial FONSI/EA on March 20, 1987. It addressed four conclusions in the EA.

Conclusion 1: The project would result in minimal impacts to the low quality fish and wildlife habitat of the project area. This *conclusion is incorrect, and, of all the conclusions, causes the most concern.* The project would result in significant impacts to the high quality fish and wildlife resources of the project area. These resources and impacts are discussed in detail in our attached draft Fish and Wildlife Coordination Act report of the Lake Operations and Outlet Channels Study, which was originally provided in July 1986. Fishery impacts ... would greatly lower the productivity of the project area fisheries ... In addition, based on a 1983 sedimentation study of the Yazoo Basin performed for your agency, *channelization of the Yalobusha River and the resultant degradation of the channel would cause nine million cubic yards of sediment to be deposited in the Yazoo mainstream, in excess to that deposited over existing conditions.* Clearly, the proposed maintenance dredging would have adverse impacts on the fishery downstream from the work reach ... The project would cause a loss of 212,795 average annualized habitat units, about a 40 percent loss of the existing fishery values.

The significant losses of wildlife habitat would result from the loss of 290 acres of forested wetlands in the right-of-ways and spoil disposal areas and the induced clearing of 686 acres of forested wetlands. The project would also reduce the

average annual acres flooded during the waterfowl season by 2,900 acres. *This reduction in flooding is of major concern to the Service, since it would occur within the best waterfowl wintering area in the State of Mississippi ...* quantification of impacts to wildlife habitat revealed a loss of 103,980 average annual habitat units.

The project would result in other impacts including the lowering of groundwater levels of the Malmaison Sump, reducing the flood storage capacity and capability of the sump, and increasing stages downstream. These impacts have significant implications relative to flooding of downstream areas such as Greenwood and the Yalobusha River mainstem.

Conclusion 2: There is no viable alternative to the proposed action.

We disagree with this conclusion because there are viable alternatives to channelizing the Yalobusha River. An example of a viable alternative to the proposed action would be our Malmaison Sump Wetland Conservation Plan (MSWCP) described in detail in our previously mentioned FWCA report. This plan would be implemented under the existing authority of the Water Resources Development Act of 1986.

Conclusion 3: The Hillside National Wildlife Refuge (NWR) and two water control structures, the Old Techeva Creek Structure and the McIntyre Lake Structure, mitigated damages of the Yazoo Headwater Project and thereby mitigated impacts of the Yalobusha River Channel Maintenance Project.

It is incorrect to conclude that the Hillside NWR and the two water control structures mitigated project damages. The Hillside NWR was acquired to partially mitigate damages of the Yazoo Headwater Project, which consists of 45 projects in the Upper Yazoo Basin, including the Yalobusha River Channel Maintenance Project. Mitigation for the Yazoo Headwater Project is not complete, and identification of additional mitigation measures is an ongoing process. Your Upper Yazoo Basin Mitigation Study, which is addressing mitigation for five of the features contained in the overall Yazoo Headwater Project, is an acknowledgement of that fact. Therefore, it cannot be said that project damages have been mitigated until mitigation for the Yazoo Headwater Project is complete.

The two water control structures, were in fact authorized 21 years ago. However, the structures have not been built; and, according to members of your planning staff, they will never be built because the cost of the structures cannot be justified. Therefore, *the nonexistent water control structures cannot be considered mitigation.*

Conclusion 4: Previous environmental impacts statements (EIS) addressed the impacts of the project.

Specifically, this conclusion states that the impacts of the project were addressed by the 1975 final EIS for the Yazoo Basin Project and the 1978 final EIS for Arkabutla Lake, Enid Lake, Grenada Lake, and Sardis Lake. *These two EIS were generic in nature and neither quantified nor discussed specific impacts of the project. A supplemental EIS to the Yazoo Basin final EIS should be prepared to discuss the new, significant impact information relative to the specific YRMP.* This supplement ... would be in keeping with a Corps response in the 1975 final Yazoo Basin EIS which stated that the 1975 EIS "... will also be supplemented as needed for specific project features."

*In summary, the project would result in significant impacts to the high quality fish and wildlife resources of the project area;* there are viable alternatives to the proposed action; the impacts of the projects have not been mitigated; and previous EIS's have not addressed the impacts of the project. As a result, we believe the overall public interest would be better served if a supplemental EIS was prepared to address the impacts of the project.... *In the absence of an EIS, the Service continues to be opposed to the Yalobusha River Channel*

*Maintenance Project due to the absence of an adequate mitigation plan.*

/s/ Stephen W. Forsythe
Acting Field Supervisor

(Emphasis supplied by the Court.) In its July 27, 1987 FONSI/EA, the Corps restated the FWS objections in the same format as in the draft.

Representatives of FWS who attended the May 5 conference broached most of these concerns anew, objecting that the mitigation plans were insufficient, that the EA should more fully address terrestrial impacts, waterfowl impacts, fishery impacts and the number of acres of wetlands to be lost; that the Corps should consider its nonstructural alternative and other alternatives; and that there was a significant impact in the project contrary to the Corps finding.

In the final EA/FONSI, the Corps restated the comments and responses as they had appeared in the revised EA/FONSI. As noted above in the Court's discussion of correspondence between the Corps and EPA, the final EA/FONSI did give a more detailed description of expected impacts on aquatic and terrestrial resources. Consideration and rejection of the FWS alternative is in identical language used in the earlier EA/FONSI. The EA also noted that $93,000 was transferred to FWS in fiscal year 1983 for design and construction of water control structures.

FWS responded to the final EA on September 1, 1987, by letter in which the FWS stated that

> Our review of the subject document reveals that the revision did not resolve the environmental concerns expressed by this agency by letter of March 20, 1987 (enclosed). Furthermore, we find that the revisions did not address or resolve many of the concerns expressed by the Service and other agencies in the May 5, 1987, workshop.

## C. THE STATE OF MISSISSIPPI

The Mississippi Department of Wildlife Conservation (MDWC) responded to the public notice by letter of October 6, 1986,

to Col. Stevens. In that letter, MDWC noted that

> The channel maintenance work proposed ... will impact an area we consider highly significant....
>
> Several months ago we met with four representatives from your agency to discuss the Lake Operations and Outlet Channels Project (LO & OC). We discussed in detail our concerns for the Malmaison WMA in particular as well as the fisheries of the Yalobusha River.... Regardless of whether we call the impact "channel maintenance" or "LO & OC," the wildlife will be impacted.
>
> A brief synopsis of our concerns we previously expressed are: 1) There are 9,483 acres of public lands in the Malmaison Area which depend upon the river for stability. One thousand acres have been reclaimed for wildlife at the public expense. 2) The Yalobusha River downstream of the dam has a significant fishery whereby more than 100,000 pounds per year are harvested in the tailwaters of Grenada Dam. Many of the fish are potamodromous and channel disturbances of this magnitude would alter the fisheries success at the spillway. 3) Blue and flathead catfish (the latter exceeding 40 pounds) are common in the river reach downstream of Avalon Bridge. Destruction of a potentially exceptional commercial fishery is certain. 4) The "Malmaison Sump" allows water to spread out and dissipate energy as well as nourish the area. Spoil banks and disturbances along the banks would alter the capacity to function in the manner it does presently.
>
> *In summary, we do not believe the proposed channel maintenance is in the best public interest.* As has been suggested before, there are other means to accomplish the same goals in a much less destructive manner....

/s/ John W. Burris
F/W Coordinator

(Emphasis supplied by the Court.) There is no discussion of the objections of the State of Mississippi's Department of Wildlife Conservation in the first FONSI/EA issued February 6, 1987.

MDWC responded to the FONSI/EA by letter to Col. Stevens on March 11, 1987. In that letter MDWC wrote to

express our concern about the section entitled Aquatic Resources.

It is the opinion of our biologists familiar with the Yalobusha that the river fisheries is in a recovery phase from the last channelization. Your opinion seems to express a *degrading* phase. In a recent study by our department, you will find the statement: "the hoop netting results indicate that an exceptional commercial fishery does exist in the lower Yalobusha River". (Garavelli, 1985 DJ Federal Aid Project F–68). We have supplied this reference to your staff in other meetings. That report also shows large flathead catfish (125 pounds in a hoop net set) are present. Other of our studies show catfish are sought (and caught) more often than those fish normally considered as "sport fish". Buffalo and catfish are a protein staple in many diets here in Mississippi. The statement in the [EA]: "Productivity of the Yalobusha River has been reduced so that it now mostly supports gizzard shad, carp and catfish...." implies there is a low value fishery there—this is simply not true.....

Knight and Thompson (1984) found fishermen harvested over 125,000 pounds at the spillway. A white bass just three (3) ounces shy of the world record came from this river. Many of the fish (white bass included) are potamodromous and pass back and forth through an area the FONSI implies to be of "high silt and heavy agricultural chemical loads".

In summary, we believe *you are about to disrupt an important natural resource and we feel that many important issues have not yet been addressed.* You have already incurred the wrath of the fishermen in the reservoirs and it seems only prudent that all the facts be considered and addressed before you undertake further disruption....

/s/ Dr. John L. Burris
F/W Coordinator

(Emphasis supplied by the Court.)

The report mentioned above was forwarded to the Corps on July 10, 1987. The accompanying letter by Dr. John Burris included the following statement:

We had indicated in our previous conversations that we felt the river was recovering and that there is an extant fisheries resource in the Yalobusha. The Jackson report strengthens that position.... What the Corps of Engineers proposes to do in the lower 12 miles of the Yalobusha will destroy the fishery there. We do not know what the effect will be on the spillway fishery—a fishery of tremendous sport and economic importance to the area. As a conservation agency, we can not endorse the project as being in the best public interest.

On October 23, 1986, the Mississippi Office of Federal–State Programs issued the State Clearinghouse review compliance notice. That notice stated that none of the state agencies involved in the review had comments or recommendations to offer at that time, concluding the State Clearinghouse review.

The Mississippi Department of Natural Resources notified Col. Stevens on June 29, 1987, that a review of the proposal by the Bureau of Pollution Control indicated that the YRMP would be in compliance with Section 301 and 303 of the Federal Water Pollution Control Act and Section 49–17–29 of the Mississippi Code of 1972, if the Corps dumped no pollutants into the water course, and if the turbidity outside the limits of a 750 foot mixing zone did not exceed the ambient turbidity by more than 50 nephelometric turbidity units.

Representatives of the Mississippi Department of Wildlife Conservation and the Bureau of Pollution Control attended the meeting on May 5, 1987. The Bureau of Pollution Control noted at that meeting that impacts on water quality seemed high for a maintenance project, and they desired more information to explain these impacts as well as the effect of the project on erosion control. MDWC expressed concern for wildlife associated with the Malmaison Wildlife Refuge, impacts on fisheries, the quantification being established for the val-

ue of fisheries and the relationship to the value of surrounding farmlands.

The *Statewide Fisheries Management Project Concerning Fishes of the Lower Yalobusha River* by Ron Garavelli was completed and submitted to the Corps. The abstract of that report stated that

> 70% of the river's sport fishery is directly dependent on the downstream passage of sport fish from Grenada Reservoir. The hoopnetting results also show an exceptional commercial fishery in the lower Yalobusha River comprising 87% of the total catch by weight. The overall catch rate of 3.6 fish and 4.4 kilograms per net day doubles the rate reported ... for the Tombigbee and Noxubee Rivers.

The report identified 53 species of fish collected from the lower Yalobusha River between July 1984 and January 1985, including paddle fish, gar, bow fin, shad, carp, shiners, buffalo, blue catfish, channel catfish, flathead catfish, perch, white bass, striped bass, striped bass hybrids, orange spotted sunfish, blue gill dollar sunfish, longear sunfish, red ear sunfish, spotted bass, large mouth bass, crappies, and freshwater drum.

In the final FONSI/EA the Corps noted that

> In the case of the portion of the Yalobusha River in question, the reduction was probably greater since *the Garavelli study found no sport fishes in its samplings.*
>
> The proposed maintenance work will contribute further to an aquatic environment that can only support species tolerant of heavy silt loads. Additionally, overbank flooding would be reduced, thereby decreasing available spawning areas for those silt-tolerant species present.
>
> The initial dollar value loss to commercial fishery as a result of the proposed maintenance work is estimated to be $182 per year. This value was determined by utilizing the draft Yazoo Basin Mitigation Study loss value of $0.73 per acre for streams in the Basin. The portion of the Yalobusha River where maintenance will

occur has approximately 249 acres of surface water.

(Emphasis supplied by the Court.)

The Corps did not respond to the direct comments and objections to the State of Mississippi in its final EA.

## D. THE MISSISSIPPI WILDLIFE FEDERATION

The Mississippi Wildlife Federation (MWF) responded to the February 6, 1987, draft EA by letter of March 27, 1987, to Col. Stevens. It states in part that

> [t]he natural resources in the vicinity of the proposed work are far more significant than described in your EA. The area to be impacted is part of what is commonly referred to as the Malmaison Sump, ... one of the more unique natural resource areas in the Yazoo Basin, if not the entire state. This uniqueness is reflected in the high acreage of remaining bottomland hardwood wetlands, compared to other parts of the Yazoo Delta. Additionally, the area is part of the number one waterfowl wintering area in Mississippi and supports an excellent fishery. Not surprisingly, all of these features are directly related to the wetness of the Malmaison Sump.
>
> [T]here is no mention of the number of acres of land, either forested or agricultural, that will be directly lost due to the increased width of the new channel.... the acreage of Section 404 wetlands that your agency estimates will be impacted is not quantified,.... any loss of valuable wetlands is significant, particularly in the Yazoo Basin. Finally, the reduction of seasonal (November–March) flooding discussed in the EA (estimated to be 12 percent) amounts to about 3,000 acres of average seasonally flooded habitat. This represents a highly significant reduction in the value of the wetlands, not only to migratory waterfowl, but also to resident waterfowl and fish.
>
> The EA glosses over the need for the work to properly operate Grenada Lake for flood purposes....
>
> [I]t is quite disturbing to this organization that the Corps of Engineers would

attempt to obfuscate the mitigation issue by claiming that structures that have been authorized for 20 years, *but never built,* have mitigated environmental damages done in 1953! Furthermore, surely your agency is aware that simply purchasing the Hillside Floodway preserved bottomland hardwoods but did nothing to mitigate the loss of seasonal flooding. Finally, whether or not mitigation has in fact been accomplished for the work done in 1953, your agency's policy regarding mitigation for operation and maintenance should have no bearing on an environmental assessment. (Emphasis in original.)

[F]urther, we find that these impacts were not discussed specifically in the 1975 or 1978 EIS's mentioned in the EA. Therefore, your Finding of No Significant Impact (FONSI) is inappropriate because it is based on an EA that inadequately reveals the impact of the proposed work.....

Although the final EA does quantify the amount of land to be lost in channelization, no specific response to the objections raised by the NWF appears anywhere in the record.

### APPENDIX B

### OTHER CORPS REPORTS

A. *Final EIS, Flood Control, Mississippi River and Tributaries, Yazoo River Basin, Mississippi, September 1975*

This impact statement covered 13,400 square miles of northwest Mississippi. The project included three separately authorized projects, the Yazoo Backwater Area Project, the Big Sunflower River Basin Project, and the Yazoo Headwater Project. These were designed as protection against headwater floods to streams in the basin, backwater floods of the Mississippi River, and to provide major runoff improvement in the alluvial valley. In the description of the Yazoo Headwater Project, the report alludes to levee wash along the lower Yalobusha:

In the delta area, levees are planned along the left (east) bank below the left

(south) bank Teoc Creek levee to connect with the Big Sand Creek Diversion channel levee. On the right (west) bank the plan includes 6.7 miles of road (levee) from Money to Whaley, Mississippi, continuing downstream 7.3 miles on the right (west) bank of the Yalobusha River to connect with the Illinois Central Gulf Railroad embankment northeast of Greenwood. Construction has not started on the levee work.

The EIS describes the Yalobusha River Basin Drainage area for the river and its tributaries under Section 2.04, Hydrologic elements at (4). This single paragraph describes the relationships of the Yalobusha River with the Schooner River, Teoc and Potacocowa Creeks, Ascalmore Creek–Tippo Bayou, and the Bogue Batupam.

The Yalobusha River is mentioned in all the pertinent tables in the study, dealing with historical floods, concentrations of pesticides, and water quality observations. Particularly as to apparent pesticide residues in water, mud, and tissue samples, levels of tested pesticides were markedly lower in the Yalobusha River than in most other rivers and streams in the region.

B. *Final Environmental Statement, Operation and Maintenance, Arkabutla Lake, Enid Lake, Grenada Lake and Sardis Lake, Mississippi, August 1978*

This EIS is directed to operation and maintenance activities on the four listed lakes. Operation and maintenance activities are generally flood control, fish and wildlife management, forestry management, waste disposal, water quality control, agricultural leasing, outdoor recreation, public safety, and master plans and appendices. The heading of flood control includes stream channelization, reservoir maintenance and the controlled release of reservoir waters. According to the description in Section I.g.2(1)

stream channelization includes the following: downstream from the lakes, natural capacities are insufficient for handling the large discharges from the lakes, and the Coldwater, Tallahatchie, Yokona and Yalobusha Rivers have

therefore been channelized for their entire lengths.... Channel improvements have been carried out by the Corps of Engineers and the Soil Conservation Service.

The hydrology of the basin is again described in Section 2.j.1.c. which describes the Yalobusha River and its tributaries. This is the extent of the description or scope of the project which deals expressly with the Yalobusha River or the area of the YRMP. The Court notes that, as in the 1975 EIS, many of the generic descriptions of the entire region—descriptions of the types of agriculture, the nature of the local economy, and the general effects of reservoir maintenance and channelization—are applicable to the area of the YRMP.

C. *An Interim Report of the Yazoo River Basin, Mississippi Lake Operations and Outlet Channels Reevaluation Report, August 1987*

This report, accompanied by voluminous appendices dealing with costs, environmental impact statement of the projects, and potential gains of the projects, is not an environmental impact statement but is a planning study to reevaluate certain features of the flood control project in the Yazoo Headwater area. One element of the LOOC study was acquisition and management of 1,000 acres of bottomland hardwoods to mitigate the "unavoidable project impacts" of the YRMP to fish and wildlife. This element of the mitigation plan was ultimately rejected. The study also provides detailed information concerning the nature of wildlife in the area and characteristics of its economic impact. Many of the tables enclosed include the Yalobusha River and its environs.

D. *Upper Yazoo Basin Fish and Wildlife Mitigation Study, Draft Feasibility Report and Environmental Impact Statement, August 1988*

This report is a study of methods to mitigate damages caused by the Upper Yazoo Project, Ascalmore Creek, Tippo Bayou Project, Big Sand Creek Project, and Panola–Quitman Floodway Eastbank Levee. It is accompanied by an environmental impact statement directed to the impact of the proposed mitigation. The Big Sand Creek Diversion Project, a constituent element of the area studied for mitigation, is a diversion of Big Sand Creek and of the Yalobusha River, with levees constructed on each side of the diversion channel. Otherwise, none of the areas subject to this mitigation study directly include the area of the YRMP. Even so, a primary focus of this study is the protection of the remaining bottomland hardwoods and wetlands currently committed to conservation use. The Malmaison Sump is identified throughout the report as the most significant of these areas. The study recommends the expenditure of $41,423,000 to mitigate the damage to the environment caused by the four projects included in the study. This would be accomplished by modification of existing projects for flood control authorized by the Flood Control Act of 1928 in order to expend roughly $1,500,000 annually for the purposes of mitigation. The Court is unaware of the current status of funding for projects recommended in the study.